**AVCO DELTA CORPORATION CANADA LIMITED, Plaintiff,**

v.

**UNITED STATES of America, Defendant-Appellee,**

v.

**NATURAL GAS PIPELINE COMPANY OF AMERICA et al., Third Party Defendants-Counterclaimants,**

v.

**CANADIAN PARKHILL PIPE STRING-ING, LTD., et al., Counter Defendants-Appellants.**

**No. 75–1705.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1976.
Decided July 23, 1976.

Frank O. Wetmore II, Chicago, Ill., for appellant.

Scott P. Crampton, Daniel F. Ross, Tax Div., Dept. of Justice, Washington, D. C., Donald B. Mackay, U. S. Atty., Springfield, Ill., John Scripp, Milwaukee, Wis., Arthur R. Kingery, Peoria, Ill., Jackson P. Newlin, Peoria, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, CUMMINGS, and PELL, Circuit Judges.

PELL, Circuit Judge.

Two issues are presented for review on this appeal: first, whether the Parkhill Companies [1] were denied due process of law in a trial, and second, whether the district court erred in sustaining the Government's contention that the assets of all three companies could be used to satisfy the tax liabilities of one company.

Canadian Parkhill Pipe Stringing, Ltd. (LTD) is a Canadian corporation formed in about 1951 which has engaged in the business of "stringing" and laying gas pipe lines in Canada. Canadian Parkhill Pipe Stringing, Inc. (INC), also known as Parkhill Pipeline Inc. as a result of a name change, is a New York corporation formed in 1962. It is a wholly owned subsidiary of LTD and was formed for the purpose of carrying out pipe laying and related projects in the United States. Canadian Parkhill Construction Equipment, Ltd. (CONSTRUCTION) is a Canadian corporation formed in 1967. It is also a wholly owned subsidiary of LTD and was formed for the purpose of owning and leasing pipe stringing and laying equipment. In 1967 the equipment owned by LTD was transferred to CONSTRUCTION

---

1. Canadian Parkhill Pipe Stringing, Ltd.; Canadian Parkhill Construction Equipment, Ltd.; and Canadian Parkhill Pipe Stringing, Inc.

in keeping with a policy that all equipment would be owned by CONSTRUCTION and leased to the other companies as well as to non-affiliated companies. INC rented equipment from dealers in addition to renting from CONSTRUCTION. Typically the rental agreements with dealers would contain an option to purchase, and if such an option was exercised, it would be exercised by CONSTRUCTION. The purpose of this policy, according to Parkhill's brief, was to take advantage of certain Canadian tax laws permitting expensing rather than capitalizing-depreciating the amounts involved in the purchases.

H. B. Sceats was at all material times the president of the Parkhill companies and owned seventy percent of the stock of LTD. The remaining thirty percent was owned by Richard Leonard, the vice-president. Sceats' office was in Toronto, Canada, all three Parkhill companies sharing office space, staff, and equipment and having the same address in Toronto, although only LTD's name was on the door. Leonard was in charge of the field operations of the companies and regularly had his office in a field trailer at a project site.

As a result of losses incurred on a pipe laying project for Natural Gas Pipeline Company in Illinois, INC was unable to pay the third quarter withholding on wages reported for that period. When Sceats sought further information from the field offices on the amount of these losses, Leonard would not allow access to field office records, apparently due to a dispute between them over control of the company.

For the purpose of raising funds with which to pay the withholding taxes, $600,000 was borrowed from Avco Delta Corporation Limited (Avco Delta). This loan was secured by a chattel mortgage executed by CONSTRUCTION, which company was also listed as debtor on the financing statement. The security on the mortgage was 29 pieces of heavy construction equipment. While CONSTRUCTION covenanted that it was the owner of the equipment, LTD and INC

executed a guarantee and indemnity agreement wherein they agreed to guarantee payment as principal debtors of debts and liabilities of CONSTRUCTION to Avco Delta as well as indemnifying that company as to any losses resulting from the transaction. Nevertheless, the taxes were not paid because the proceeds of the loan were deposited in the Royal Bank of Toronto, which institution forthwith set off the money against a guarantee of an obligation of LTD to the bank for previous borrowings, the proceeds of which had been advanced to INC by LTD as a loan for the Natural Gas Pipeline job.

In February of 1970 the Internal Revenue Service seized all of the equipment which had been used by INC on the Natural Gas Pipeline job. It also seized other items located elsewhere in the United States. It served notices of levy upon Natural Gas Pipeline Company on the retainage it held on the Illinois project. Other levies made are not involved in this appeal. Pursuant to an agreement among the parties, the equipment was sold and the proceeds were placed in escrow.

Litigation emanating from that project has been before this court twice previously. The first instance arose from the suit of Avco Delta against the United States and the Parkhill companies in an endeavor to establish priority of the mortgagee's claim over that of the Government. Avco Delta prevailed in the district court with the judgment being affirmed here. 459 F.2d 436 (7 Cir. 1972). Avco Delta is no longer an active participant in the litigation. The sale of the mortgaged equipment, however, produced an excess of some $600,000 over the amount needed to pay off Avco Delta and that excess amount is involved in the present appeal.

The Parkhill companies urged that they would be denied due process of law in a trial if the funds levied upon by the United States were not released for their use to pay counsel and prepare their case because their other funds had been exhausted.[2]

2. The record is unclear regarding the availability of assets in Canada. The Parkhill counsel seems to indicate that there are none, but the

Government indicates that there is no evidence showing this.

The district court in advance or trial ordered funds released. The second appeal in part involved this issue. This court reversed, 484 F.2d 692, 707 (7th Cir. 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974), holding:

> The contention that the Government's actions will cause an unfair trial in the future is . . . capable of determination only after that trial takes place.
>
> . . . The Government should be on notice, however, that we will carefully scrutinize any further appeals to see if in fact Parkhill has been denied due process of law by a constitutionally violative overreaching by the Internal Revenue Service. [Footnote omitted.]

This court remanded the case for proceedings not inconsistent with its opinion.

On remand, the district court appointed a practicing attorney as a special master to hear the remaining issues of the case, including the issues of the amount of tax liability and whether the assets of LTD and CONSTRUCTION could be used to satisfy the liabilities of INC.

Before the hearing the Government sought to require discovery and to require the presence of Sceats for that purpose in Illinois. That discovery was refused by the Parkhill companies on the grounds, inter alia, that the Government previously had access to all Parkhill records, that there had been suggestion of criminal proceedings against Sceats about which Government counsel had refused to answer any questions, and that Parkhill counsel suspected that the requested presence was a ruse to entice Sceats into the United States so that he could be arrested and held on criminal charges. During the time prior to the special master's hearing, counsel who had been regularly representing the Parkhill companies in this litigation, being the same counsel representing the companies on this appeal, participated in matters before the district court. The appearances included the filing of written objections to the Government's efforts to secure discovery.

Subsequently the Government moved for a default judgment against the Parkhill companies for failure to comply with the discovery requests. A response to this motion was filed on behalf of the companies. The district court, noting the time that had elapsed since the institution of litigation during with discovery could have been accomplished and also adverting to this court's caution against overreaching conduct on the part of the Government, denied the motion for default judgment.

The hearings before the special master commenced on November 20, 1974, and continued on the following day and November 27 resulting in a 283-page transcript. The Parkhill companies' counsel declined to participate in this hearing in any way. Nevertheless, the special master sua sponte did inquire into some of the Parkhill charges concerning claimed embezzlements. On April 21, 1975, the special master filed a detailed 33 page report[3] setting forth his findings of fact and conclusions of law, but noting that the proceedings were somewhat less than full adversary hearings as a result of the failure of the Parkhill companies to participate in them. He also observed that consequently "this portion of my report [pertaining to tax liability] can be little more than a rationalization and summary of the evidence presented by the Government."

The report stated that the Government had presented convincing proof of its charge that the Parkhill companies should be treated as one entity and that CONSTRUCTION and LTD should be liable for the debts of INC. The special master found that the Parkhill companies had failed to meet their burden of proof to overcome the Government's presumption of correctness

---

**3.** We entertain no feeling that literal length is necessarily equated with figurative depth. Here, however, our examination of the special master's report does indicate the existence of the equation.

regarding the taxes assessed and held that civil fraud penalties were properly assessed. He made meticulous findings regarding the various deficiencies alleged and concluded that the Parkhill companies owed taxes, interest and penalties incurred by INC of $2,470,233.98 plus interest and penalties accruing after September 23, 1974. The taxes included income tax deficiencies for 1967 and 1968 and withholding and FICA taxes for the third and fourth quarters of 1969. In accord with this court's earlier holding, the master found that certain counterdefendants had valid claims against the retainage from the Natural Gas Pipeline Company job in Illinois. See 484 F.2d at 705. He ruled that after their claims were satisfied, the balance of the retainage fund, approximately $143,000, should be paid to the Government. He also held that the Government was entitled to the proceeds remaining from the sales fund, approximately $600,-000.

Counsel for the Parkhill companies again entered the litigation and filed extensive and specific objections to the special master's report. The Government also filed objections to the report particularly with respect to the master's finding that the Government had presented no satisfactory evidence as to the precise amount of employment taxes on the Natural Gas Pipeline project. The district court after consideration of the objections and after hearing oral argument concluded that the report "is in no sense clearly erroneous in any particular; but, on the contrary, it is eminently sound in each particular on which objection or comment has been made, as well as in all other respects, and that therefore it should be adopted by the court." It further found that no constitutional rights of any of the Parkhill companies had been violated. Adopting the report in full, the court entered judgment against the Parkhill companies, jointly and severally, for $2,577,759.53. This represents the sum found owing by the master plus interest and penalties which had accrued through the date of judgment. The funds were ordered disbursed as the master had reported. The present appeal

followed. The Government has not cross-appealed.

## I. Due Process

Parkhill counsel argues that as a result of the seizure by the Government of the companies' assets located in the United States, the companies have been unable to afford to prepare a defense and as a result have been denied due process of law. The companies cite many cases which hold that a basic requirement of due process is the right to be heard, although we note that none of these cases indicate that an indigent corporation has a right to counsel compensated by the Government in a civil case. The companies also cite cases which hold that a corporation may only appear in court by counsel; but these are unavailing because the Parkhill companies have at all times been represented by counsel in proceedings involving issues of law, such as the present appeal, and they have not shown that counsel could not have appeared under a similar arrangement at the hearing on the factual issues. The essence of the companies' argument is that they lacked funds to conduct discovery and use accounting services necessary for a defense.

Tax assessments by the Commissioner are presumed correct. Although the Government has the burden of proving fraud by clear and convincing evidence, the findings of fraud by the trier of fact must be affirmed unless clearly erroneous. *Estate of Upshaw v. Commissioner*, 416 F.2d 737, 740–41 (7th Cir. 1969), *cert. denied*, 397 U.S. 962, 90 S.Ct. 993, 25 L.Ed.2d 254 (1970). The taxpayer has the burden to show an assessment is incorrect. *United States v. Lease*, 346 F.2d 696 (2d Cir. 1965). A general denial of liability is insufficient to meet the taxpayer's burden. *United States v. Prince*, 348 F.2d 746 (2d Cir. 1965). We do not interpret the Supreme Court's decision in *Commissioner v. Shapiro*, 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976), as modifying these general rules so long as the Government shows that its claims have a basis in fact.

When this court remanded this case for trial, it was implicit in our holding that the Parkhill companies should make a good faith attempt to defend their rights. 484 F.2d at 706–07. The court stated: "The contention that the Government's actions will cause an unfair trial in the future is still capable of determination only after that trial takes place." *Id.* at 707. The opinion in *United States v. Brodson*, 241 F.2d 107 (7th Cir. *en banc* 1957), *cert. denied*, 354 U.S. 911, 77 S.Ct. 1297, 1 L.Ed.2d 1428, upon which this court relied in remanding, indicated that a denial of due process claim should not be decided prior to trial because many factors could cause decision of the issue to become unnecessary. Inherent in the prematurity holding was the contemplation that a trial would be held at which the defendants would make all reasonable efforts to defend. The Parkhill companies did nothing to protect their rights at the hearing.

Our prior holding denying access to the seized funds for use by the Parkhill companies for legal and other costs contains no suggestion that a look at the situation after trial would find an overreaching of constitutional violative proportions where there was no convincing showing of an effort to take all reasonably available steps by way of asserting defenses. Here, no doubt, it was deemed that the picture of lack of fairness of proceedings, or lack of due process, would be more explicit and dramatic if there was no participation whatsoever. We find no indication in the record, however, that either the district court or the special master permitted the Government to gain a victory on a simple default basis.[4] We find no indication that the special master in conducting the hearing or the district judge in approving the report relieved the Government of the necessity of proving its case. That doing so may have been easier for the Government because of lack of opposing counsel does not cause the resulting trial to lack due process.

The fairness of procedure that is due process is not determined by isolating out of context one part of the total proceedings by which rights are determined. Viewing the situation here from that point of view, we are unable to agree with the Parkhill companies that a reversal is required for the purpose of affording them an opportunity for participating in a trial. They have already declined that opportunity.

In their original brief in this court, apparently anticipating a Government argument, the Parkhill companies stated:

> The Government has suggested that the refusal of Parkhill counsel to participate in that trial is solely based upon the unwillingness of the lawyers to spend the time required without assurance of being paid. That clearly is not the case, as has been demonstrated by the participation of counsel in these proceedings where matters of law alone are involved.

The only reason which we find suggested for the same "participation of counsel" not carrying over into the special master's hearing is that there was no money with which to hire accountants and to engage in discovery. We will have to have it demonstrated to us, however, that if competent counsel (and there has been no indication in the present case that the Parkhill companies' counsel was otherwise than well qualified) participates in a hearing, even though complex facts are involved, he cannot by dint of cross-examination and objection demonstrate the frailties of the efforts of the party having the burden of proof, here the Government. Also, here we note that counsel was no newcomer to the litigation but presumably would have brought with him during participation in the hearing a background of information that would have served to demonstrate, if they existed, the weaknesses of the Government's case. Counsel did reactivate after the master's report was filed and presented and argued

---

4. The appellants' argument carried to its logical extreme would seem to exclude the possibility of default judgments since the defendants in such cases have been denied a hearing. The prime emphasis, it appears to us, in the due process context is whether there is an opportunity for a fair hearing.

objections to the district court which rejected them.

■ In sum, we hold that the Parkhill companies were not denied due process of law. The companies made the tactical choice not to participate in the hearing and cannot complain now that they were denied due process. Undoubtedly many of the companies' difficulties have been caused by the dispute between the majority and minority shareholders, Mr. Sceats and Mr. Leonard, and by Mr. Sceats' somewhat understandable reluctance to risk criminal prosecution by entering the United States to testify and present his version of the events. Nevertheless, the United States did not cause the dispute between the shareholders; and the fact that a knowledgeable witness, for reasons satisfactory to him, declines to testify does not vitiate the proceedings from which he absented himself.

## II. Availability of All Companies' Assets

Some of the items seized by the Government were the property of LTD and CONSTRUCTION. The Government argues that these assets are available to satisfy the debts of INC either under a fraudulent transfer theory or upon the premise that the companies are alter egos of each other. Because of the conclusion we reach on the alter ego theory, we need not consider the fraudulent transfer theory.

The Parkhill companies argue that even assuming the findings upon which the master relied were correct, the Government failed as a matter of law to sustain its allegation that the companies were alter egos of each other. The basis for this argument is that the master did not find that the corporations had no business purpose. The companies rely on cases such as *Moline Properties Inc. v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), and

*National Carbide Corporation v. Commissioner*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), as well as others, which hold that for the purpose of determining taxes, corporate entities may not be disregarded even where a high degree of control is maintained by one over others if the corporations have a business purpose. These cases are inapposite because the Commissioner did not disregard the corporate entities in assessing taxes. The Commissioner argued, and the lower court found, that the corporate entities could be disregarded for the purpose of satisfying liabilities. This was not a tax theory but rather was a theory that was available to any creditor.[5]

In *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 160 (7th Cir. 1963), upon which the special master relied, this court stated the elements which must be present for one corporation to be held liable for the debts of another:

> [C]ontrol by the parent to such a degree that the subsidiary has become its mere instrumentality; fraud or wrong by the parent through its subsidiary, e. g., torts, violation of a statute or stripping the subsidiary of its assets; and unjust loss or injury to the claimant, such as insolvency of the subsidiary.

We recently reaffirmed this holding in *Bernardin, Inc. v. Midland Oil Corp.*, 520 F.2d 771 (7th Cir. 1975). *Cf. Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991, 995 (5th Cir. 1972), *cert. denied*, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89. This theory has been applied in at least one tax case other than the present one. *In Matter of H. G. Prizant & Co.*, 69–2 U.S.T.C. ¶ 9592 (N.D.Ill. 1969).

The master made many findings which properly support his conclusion that the companies were alter egos. He found that INC and CONSTRUCTION were wholly owned subsidiaries of LTD; the companies had identical officers and directors and

---

5. Government counsel would distinguish these theories by calling the former an alter ego theory and the latter an instrumentality theory. The terminology used in the cases lacks sufficient uniformity to use this distinction. The distinction must be drawn on the basis of whether the corporate entities are being disregarded for the purpose of assessing taxes or for the purpose of collecting liabilities.

were operated as one company; their president considered them as one; the companies had the same offices, the same telephone number, the same accounting service, the same employees, the same mailing address, and the same furniture while only LTD's name appeared on the door of the offices; INC's and CONSTRUCTION's paid-in capital was grossly inadequate; the companies failed to maintain their respective identities when dealing with third parties and failed to maintain customary formalities when dealing with each other; and during the period of 1967 through 1970 the only business of LTD and CONSTRUCTION was leasing equipment to INC, and neither CONSTRUCTION nor LTD produced revenues from third parties. These findings are very similar to the items which this court listed in *Turner* as factors which courts generally consider to determine if the requisite degree of control is being maintained so that one corporation may be considered an instrumentality of another. 324 F.2d at 161.

Further findings were made from which the special master could properly conclude that sufficient wrong had been committed for the corporate entities to be ignored; indeed, the special master concluded: "A gross injustice would be done if the three Parkhill companies were not treated as one entity." He found that LTD took title to certain items of equipment although INC apparently paid the purchase price; the companies' president instructed an attorney by letter to take such steps as were necessary to show clear title to certain pieces of equipment in CONSTRUCTION although some of the pieces had been purchased by INC and some by LTD; sometime after that letter, a bill of sale was prepared dated March 15, 1968, purporting to transfer certain items of equipment for the stated consideration of $1.00 and other valuable consideration;[6] one of the items listed on the bill of sale was not manufactured until sometime in 1969; sometime after the letter a bill of sale dated October 15, 1969, was prepared which purported to convey the equipment listed in the bill of sale dated March 15, 1968, and four other items to CONSTRUCTION (From LTD) for the stated consideration of $1.00 and other valuable consideration; the equipment on the bill of sale dated October 15, 1969, included equipment purchased by INC which had a market value in excess of $900,000; the bills of sale dated March 15, 1968, and October 15, 1969, were not reflected upon any books, records, or tax returns of any of the three companies; and during the fourth quarter of 1969 INC's liabilities far exceeded its assets.

In light of these findings, we hold that the special master correctly applied the standards of *Turner* and therefore that his conclusion regarding the availability of the assets of LTD and CONSTRUCTION to satisfy the tax liability of INC must be upheld.

For the reasons given in this opinion the judgment of the district court is

AFFIRMED.

---

6. Ordinarily we would attach little or no importance to the use of the "One dollar and other valuable consideration" phraseology. This is a commonly used device, without illegitimate connotations, flowing in large part no doubt from a desire to deprive a curious but non-entitled public of knowledge of what the actual contractual consideration might be. While we give its use little significance in the present case, we cannot, in the context of its use, entirely ignore it.