AMERICAN TRADING AND PRODUC-
TION CORPORATION et al.,
Plaintiffs,
v.
FISCHBACH AND MOORE, INCORPO-
RATED, et al., Defendants.

The AMERICAN INSURANCE COM-
PANY, Inc., et al., Plaintiffs,
v.
FISCHBACH AND MOORE, INCORPO-
RATED, et al., Defendants.

Nos. 68 C 1308, 69 C 26.

United States District Court,
N. D. Illinois, E. D.

March 24, 1970.

See also D.C., 47 F.R.D. 155.

John P. Gorman, John J. Witous and
Richard C. Clark, Clausen, Hirsh, Miller
& Gorman, Chicago, Ill., for plaintiffs.

Justin A. Stanley, Roger W. Barrett, Bryson P. Burnham, and Robert F. Finke, Mayer, Brown & Platt, Chicago, Ill., for defendant Fischbach and Moore, Incorporated.

Michel A. Coccia, Baker & McKenzie, Patrick S. Filter, Carey, Filter, Murray & White, and Gordon R. Close, Lord, Bissell & Brook, Chicago, Ill., for defendant Fischbach & Moore Electrical Contracting, Inc.

## MEMORANDUM OPINION

DECKER, District Judge.

McCormick Place, an exposition hall in Chicago, Illinois, was destroyed by fire on January 16, 1967. Also destroyed were exhibits scheduled to be displayed at the Semi-Annual National Housewares Show, which was to begin that day. The plaintiffs in these consolidated cases are these exhibitors and their subrogees, and insurance company subrogees of the Metropolitan Fair and Exposition Authority, which owned and operated McCormick Place. Defendants are Fischbach and Moore, Incorporated and its wholly-owned subsidiary, Fischbach and Moore Electrical Contracting, Inc.[1] The complaints sound in tort and allege that faulty electrical wiring installed by defendants in McCormick Place for the Housewares Show was the cause of the fire.

Defendant Fischbach and Moore, Incorporated has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, contending that it has neither performed electrical work in McCormick Place nor acted in a manner making it liable for the alleged torts of its Subsidiary. Because the pleadings, affidavits, depositions, answers to interrogatories and exhibits on file demonstrate that no genuine issue of material fact exists, and because the undisputed evidence clearly shows that the Parent did not itself furnish the allegedly defective electrical work, nor operate the Subsidiary as its "mere instrumentality," the motion for summary judgment is granted.

Fischbach and Moore, Incorporated is a publicly held New York corporation with its principal place of business in New York City. Active primarily in the business of electrical contracting and related endeavors, it has divisions and approximately 20 subsidiaries throughout the United States and Canada which are similarly engaged. Among the latter is defendant Fischbach and Moore Electrical Contracting, Inc., a Delaware corporation with its principal place of business in Chicago, Illinois.

It is undisputed that the Parent corporation has never been a party to a contract with the management of McCormick Place, and that none of its employees has provided electrical installation or supervisory services for McCormick Place. Its asserted liability for damages must rest, therefore, not on its own performance of electrical work but on such performance by the Subsidiary.

■. For a corporation to be held liable for the torts of a subsidiary, it must appear that the subsidiary was operated as a "mere instrumentality" of the parent. Taylor v. Standard Gas & Electric Co., 96 F.2d 693 (10th Cir. 1938), rev'd on other grounds, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669. This rule is rarely applied, and only under special circumstances, for it runs contrary to the established principle of corporate limited liability. "The instrumentality rule should only be invoked after mature consideration and caution. Indiscriminate application would destroy the purpose of the corporate law." Brown v. Margrande Compania Naviera, 281 F.Supp. 1004, 1006 (E.D.Va.1968).

The tests to be applied were set out in Steven v. Roscoe Turner Aeronautical

---

1. Hereinafter Fischbach and Moore, Incorporated is sometimes referred to as the "Parent", and Fischbach and Moore Electrical Contracting, Inc. is sometimes referred to as the "Subsidiary". Prior to and at the time of the fire, Fischbach and Moore Electrical Contracting, Inc. was known as Fischbach, Moore and Morrissey, Inc.

Corporation, 324 F.2d 157 (7th Cir. 1963), at 160:

> "In order to establish that a subsidiary is the mere instrumentality of its parent, three elements must be proved: control by the parent to such a degree that the subsidiary has become its mere instrumentality; fraud or wrong by the parent through its subsidiary, e. g., torts, violation of a statute or stripping the subsidiary of its assets; and unjust loss or injury to the claimant, such as insolvency of the subsidiary."

Application of these principles to this case requires a narration of the facts relating to the interrelationship of the two defendant corporations. The pertinent factual details, which are undisputed, follow.[2]

At the time of the fire, all four of the Subsidiary's directors were also directors of the Parent, and four of the Subsidiary's eight officers were also officers of the Parent. However, the corporations maintain separate offices and conduct separate directors' meetings. The financial books and records of the Subsidiary are maintained by its employees in Chicago, and contain only entries related to its own operations. The Subsidiary has its own bank accounts and negotiates its own loans from third parties; however, these loans are reviewed and guaranteed by the Parent. On occasion, the Subsidiary has borrowed money from the Parent; these loans are evidenced by notes and call for interest at the prime rate.

The Subsidiary and Parent file separate tax returns. However, financial statements of the Parent and all subsidiaries are consolidated. The payroll of the Subsidiary is paid by the Subsidiary rather than the Parent, and salary levels are determined by the Subsidiary subject to review by the Parent. The Subsidiary has never purchased goods or services from the Parent, nor has the Parent purchased goods and services from the Subsidiary. Purchasing is independently handled by each corporation, as are labor union relations.

The Subsidiary notifies the Parent of bids made on contracting jobs and of contracts awarded. However, neither bids nor contracts are reviewed by the Parent, nor are matters relating to the manner of performance and the materials to be used subject to review. On contracts exceeding $5,000,000 the profit "mark up" to be charged may be determined after consultation with the Parent. The Subsidiary forwards schedules to the Parent regarding new jobs acquired and contracts on hand for each three month period, and submits reports on material purchases, estimates, salary changes and financial data on a more frequent basis.

On one occasion the Subsidiary sought review by the Parent of a lease it had negotiated for additional yard space for its equipment. On other occasions, the Parent has determined which of its subsidiaries should bid on a particular project. There is evidence that the Parent's management considered it and the subsidiaries to be one "family". This is reflected in some annual reports and in advertising in Fortune magazine, wherein the Parent claimed the credit in its own name for projects (including McCormick Place) in fact performed by the Subsidiary.

Financial data of record reveals that the Subsidiary's net worth was $511,503 in 1966 and $684,574 in 1967. It paid dividends of $100,000 in 1966 and $369,000 in 1967, which amounts represented substantially all of its after tax earnings. The corresponding gross income figures for those years, $6,128,000 and $12,798,000, represent 4.42% and 8.07%, respectively, of the consolidated gross income of the Parent and its subsidiaries. The Parent's gross income, apart from the income from sub-

---

2. Facts cited by the parties which occurred after the fire are of doubtful relevance to the issues presented here. In any event, they add nothing of significance to the factual picture and are therefore not noted herein.

sidiaries, approximated $77,000,000 in each of these two years.

The Parent and all subsidiaries are participants in a group liability insurance policy. The Subsidiary pays its own share of the premium, and has $15,-000,000 worth of coverage applicable to liability arising out of the McCormick Place fire.

■ These facts, even when viewed in the light most favorable to the plaintiffs, United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), conclusively show that the Subsidiary is not the mere instrumentality of the Parent, as that concept has been defined in the case law. Neither ownership of all of the stock of a subsidiary, nor identity of officers and directors, nor both combined are sufficient to justify "piercing the corporate veil." Superior Coal Company v. Department of Finance, 377 Ill. 282, 289–290, 36 N.E. 2d 354 (1941); McDermott v. A. B. C. Oil Burner Corp., 266 Ill.App. 115, 120 (1932). "While stock control and common directors and officers are generally prerequisites for application of the instrumentality rule, yet, they are not sufficient by themselves to bring the rule into operation. * * * Such factors are common business practice and exist in most parent and subsidiary relationships." Steven v. Roscoe Turner Aeronautical Corp., *supra,* 324 F.2d at 161.

The additional factors which must be present have been variously described as "direct intervention" in the subsidiary's affairs, Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 31 F.2d 265, 267 (2d Cir. 1929), the "act of operation" of the subsidiary's business, Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, at 61 (1926), or "the exercise of control, not the opportunity to exercise control." Brown v. Margrande Compania Naviera, *supra,* 281 F.Supp. at 1006.

The facts of record here show at most that the Parent exercises supervision and guidance of the general performance of the Subsidiary. Thus it requires various financial reports and is consulted as to mark ups on large jobs. It is clear, however, that the Parent does not "operate" the business. It does not compute bids, negotiate contracts or purchase goods and services for the Subsidiary. It does not supervise the manner in which the Subsidiary's contracting jobs are performed, and it does not use its own goods, equipment or employees in the Subsidiary's business operations.

■ Exercise of some degree of supervision by a 100% stockholder is not sufficient to render the subsidiary its instrumentality or alter ego. "That a stockholder should show concern about the company's affairs, ask for reports, sometimes consult with its officers, give advice, and even object to proposed action is but the natural outcome of a relationship * * *." United States v. Elgin, J. & E. Ry., 298 U.S. 492, 503–504, 56 S.Ct. 841, 844, 80 L.Ed. 1300 (1936). In Steven v. Roscoe Turner Aeronautical Corporation, *supra,* 324 F.2d at 162, similar supervisory concern was held to be "sound business practice" which did not raise "a genuine factual issue under the instrumentality rule." Such participation in a subsidiary's affairs does not amount to the domination of day to day business decisions and disregard of the corporate entity necessary to impose liability on a parent. Davis v. John R. Thompson Co., 239 Ill.App. 469, 475 (1926); Dregne v. Five Cent Cab Co., 381 Ill. 594, 602–603, 46 N.E.2d 386 (1943); United States v. Reading Co., 253 U.S. 26, 62–63, 40 S.Ct. 425, 64 L.Ed. 760 (1920).

■ Another factor deemed significant in applying the instrumentality test is the extent to which corporate formalities are observed. Holland v. Joy Candy Manufacturing Corp., 14 Ill. App.2d 531, 145 N.E.2d 101 (1957); Steven v. Roscoe Turner Aeronautical Corporation, *supra,* 324 F.2d at 161. In the instant case, separate corporate identities are scrupulously maintained. The physical locations of the corporations are different; the records of each

are separately maintained; there is no commingling of funds; payrolls are separately administered; contracts are independently negotiated and signed; assets are not transferred back and forth; and purchasing, hiring and firing are independently conducted. The fact that the Parent considers its subsidiaries to be members of a "family" does not destroy the separate existence of each member. New Orleans & N. E. Ry. Co. v. Hewett, 341 F.2d 406, 408 (5th Cir. 1965). Nor does the Parent's boastful advertising show in any way that corporate identities were otherwise ignored by the participants in the conduct of their enterprises.

Moreover, even if it could be said that the Subsidiary were the mere instrumentality of the Parent, that circumstance by itself would not justify imposition of liability. For it has long been the law that the corporate entity is only ignored when the ends of justice require it. Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); Anderson v. Abbott, 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793 (1944). Some element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard the corporate fiction. Fisser v. Int'l Bank, 282 F.2d 231 (2d Cir. 1960); Shamrock Oil & Gas Co. v. Ethridge, 159 F.Supp. 693 (D.Colo.1958).

None of the elements of injustice relied on in earlier cases exist here. It has not been shown or even suggested that the operators of McCormick Place, or the exhibitors, believed they were dealing with the Parent rather than the Subsidiary, or were misled as to the financial strength of the Subsidiary. See Zubik v. Zubik, 384 F.2d 267, 272–273 (3d Cir. 1967), cert. den. 390 U.S.

988, 88 S.Ct. 1183, 19 L.Ed.2d 1291. On the contrary, it is clear that the Parent played no part in the electrical installation in McCormick Place and that the Subsidiary conducted its affairs in its own name. The record is barren of any evidence of misrepresentation, deception or mistake.

Nor has the Parent stripped the Subsidiary of its assets or otherwise operated it as an undercapitalized "sham" or "dummy". The Subsidiary is an independent and self sufficient operating entity, with ample net worth and income to meet the needs of its operations. Furthermore, it carries liability insurance in excess of the extraordinary damages allegedly suffered by these complainants. There is no evidence here "of such complete control of the subsidiary by the parent as to render the former a mere tool of the latter, and to compel the conclusion that the corporate identity of the subsidiary is a mere fiction." National Lead Co. v. Federal Trade Commission, 227 F.2d 825, 829 (7th Cir. 1955).

Thus no fraud, injustice or unfairness has been suggested or disclosed which would justify ignoring the separate identities of these two corporations. To impose liability in such circumstances would be an unwarranted invasion of the established principle of limited liability, which was properly and understandably relied upon by these defendants in the conduct of their separate affairs.

Because defendant Fischbach and Moore, Incorporated neither participated in the acts allegedly causing plaintiffs' damages, nor treated its subsidiary co-defendant as its mere instrumentality, an order will enter granting its motion for summary judgment and dismissing it from this consolidated cause.