NORTHERN ILLINOIS GAS COMPANY, an Illinois Corporation, Plaintiff,

v.

TOTAL ENERGY LEASING CORPORATION, a Delaware Corporation, Defendant.

No. 77 C 1792.

United States District Court, N. D. Illinois, E. D.

Nov. 28, 1980.

James W. Gladden, Jr., Alan R. Borlack, Mayer, Brown & Platt, Chicago, Ill., for plaintiff.

Jay Erens, Michael A. Weinberg, Levy & Erens, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

FLAUM, District Judge:

This matter comes before the court on plaintiff Northern Illinois Gas Company's ("NI–GAS") motion for summary judgment on the complaint pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set forth below, the motion for summary judgment on the complaint is granted.

NI–GAS, an Illinois public utility, filed suit against the defendant Total Energy Leasing Corporation ("TELCO"), a Delaware corporation with its principal place of business in New York, based upon diversity of citizenship. See 28 U.S.C. § 1332 (1978). NI–GAS seeks recovery of $45,471.59 for gas sold to a subsidiary of TELCO's, Dixie Energy Corporation ("DEC"), during the period of September 1976 to February 1977. In order to recover this amount, NI–GAS asks this court to "pierce the corporate veil" between TELCO and DEC in order to hold TELCO responsible for the debt of its subsidiary.

The affidavits and depositions of both parties establish the following facts. Prior to 1974, DEC executed contracts with NI–GAS whereby NI–GAS supplied DEC's energy plant at the Dixie Square Shopping Center ("Dixie Square") in Harvey, Illinois. In 1974, TELCO created a wholly–owned subsidiary, Dixie Energy Services Corporation ("DESC"), which purchased one hundred percent of DEC's stock from individual

third–party stockholders. (Deposition of George Myrtetus at 10–11.) According to their documents of incorporation, DEC and DESC are engaged in the same business: construction and operation of a power station at Dixie Square. (*Id.* at 6–8.) DESC, however, apparently serves no function other than the ownership of DEC. (Deposition of Merton Levey at 8.) Thus, TELCO owns all of the stock of DESC which in turn owns all of the stock of DEC. (TELCO Answer to NI–GAS Interrogatory No. 2.)

TELCO, DEC, and DESC have the same officers and directors.[1] (TELCO Answer to NI–GAS Interrogatory No. 1.) The officers and directors are: George Myrtetus ("Myrtetus"), president and a director of TELCO, DEC, and DESC; Meyer Steinberg ("Steinberg"), treasurer and a director of TELCO, DEC, and DESC; and Merton Levey ("Levey"), vice–president and a director of TELCO, DEC, and DESC. (*Id.*) Myrtetus, Steinberg, and Levey receive no compensation or salaries for their positions as officers and directors of DEC and DESC. (TELCO Answer to NI–GAS Interrogatory No. 5(a).) Rather, the officers apparently only receive compensation for their positions as officers and directors of TELCO. Moreover, Steinberg apparently did not know whether he was an officer of DEC and DESC. (Deposition of Meyer Steinberg at 4.) DEC's non-officer employees also were paid directly by TELCO. (Deposition of George Myrtetus at 24–25.) In addition, payroll accounts of all TELCO subsidiaries were centralized in that TELCO had a single account to pay the employees of all subsidiaries. (*Id.*) Neither DEC nor DESC has ever distributed profits or dividends. (TELCO Answer to NI–GAS Interrogatory No. 4(c).) DESC had no profits or losses from 1974 to 1977. (TELCO Answer to NI–GAS Interrogatory No. 7(c).) The board of directors' meetings for DEC and DESC were held concurrently. (TELCO Answer to NI–GAS Interrogatory No. 6(b); Deposition of George Myrtetus at 16.) There apparently was no formal separation at these meetings between the corporate business of DEC and that of DESC. (Deposition of George Myrtetus at 16.) All of these meetings were held at TELCO's New York office. (TELCO Answer to NI–GAS Interrogatory No. 6(b).) The financial records of DEC and DESC are kept at TELCO's New York office. (TELCO Answer to NI–GAS Interrogatory No. 7(d).) Expenses for trips by the directors on behalf of DEC and DESC were paid by TELCO. (Deposition of George Myrtetus at 57; Deposition of Merton Levey at 55–56.)

DEC has a capitalization of $2,000. (Amended Affidavit of Merton Levey at ¶ 9.) In 1976, two years after TELCO's acquisition of DEC, DEC's capital stock and earned surplus was minus $51,796.15. (TELCO Answer to NI–GAS Interrogatory No. 7(b).) Steinberg loaned $100,000 to DESC for the acquisition of DEC.[2] (Deposition of Meyer Steinberg at 7.) This loan was reflected in a note given to Steinberg by TELCO. (*Id.* at 7–8.) DEC, however, not TELCO, paid approximately $15,000 in interest on Steinberg's loan. (TELCO Deposition Exhibit No. 9.) In 1976, Steinberg issued a check to DEC for $20,000 which was "used to meet operating cost deficits." (*Id.*) Again, Steinberg received a note for the loan from TELCO. (*Id.*; Deposition of Meyer Steinberg at 28.) DEC is insolvent. (TELCO Answer to NI–GAS Interrogatories Nos. 7(b) and 7(c).) DEC has assets in the form of a plant and equipment which were owned by DEC prior to TELCO's acquisition of DEC. (Affidavit of Merton Levey, October 1979, at ¶ 7.)

Levey, vice–president of TELCO, DEC, and DESC but compensated only for his position with TELCO, and operating out of TELCO's office in New York, negotiated all service agreements for DEC and supervised billing procedures. (Deposition of Merton Levey at 18.) The only persons authorized to sign checks for DEC were Myrtetus and Steinberg, both persons only compensated

---

1. TELCO has one additional director. (TELCO Answer to NI–GAS Interrogatory No. 1.)

2. This was accomplished by creating DESC which purchased all of DEC's stock from individual third–party stockholders. (Deposition of Meyer Steinberg at 6.)

for their position with TELCO and operating out of TELCO's New York office.[3] (Deposition of George Myrtetus at 58.) No formal financial records of DEC were kept at Dixie Square. (*Id.* at 59.) DEC customer complaints normally went directly to Levey at TELCO's office in New York. (Deposition of Merton Levey at 50.) Labor negotiations for DEC were conducted by Myrtetus, who was compensated only for his position as president of TELCO and operated out of TELCO's office in New York. (Deposition of George Myrtetus at 59.)

In November 1976, Levey corresponded with J. C. Penney Company ("Penney"), objecting to deductions from Penney's payments and threatening to cut off services to Penney's store at Dixie Square. (TELCO Deposition Exhibit No. 22.) The letter from Levey was written on TELCO stationery and responded to notifications of intended deductions sent by Penney to TELCO. (TELCO Deposition Exhibit No. 25.) In addition, in 1976, Commonwealth Edison provided temporary electric power to Dixie Square and sent billing and correspondence directly to Levey at TELCO. (TELCO Deposition Exhibit No. 26.) In November 1976, letters were sent to the tenants of Dixie Square demanding payment for services and threatening a cutoff of services if payment was not forthcoming. These letters were written on TELCO stationery and

signed by Levey simply as "Vice President." (TELCO Deposition Exhibit No. 28; Deposition of Merton Levey at 65–67.) Also in 1976, the purchase order for repairs to a boiler at Dixie Square was sent out on TELCO stationery. (TELCO Deposition Exhibit No. 30; Deposition of Merton Levey at 71.)

Monies for DEC's share of overhead for all TELCO operations were not paid by DEC to TELCO on any regular basis or pursuant to any schedule. (Deposition of George Myrtetus at 20.) There was no contract between DEC and TELCO for the payment of overhead. (*Id.* at 28.) Several alleged overhead payments by DEC to TELCO were made in the weeks immediately preceding the date when DEC ceased operation. (TELCO Deposition Exhibit No. 10.) While this TELCO memorandum shows certain overhead payments from DEC to TELCO for the period of October 1975 to February 1977,[4] other TELCO memoranda show that some of the payments were not in fact overhead but in one instance were transferred at the advice of counsel[5] and in another instance in view of the pending demise of DEC.[6] (TELCO Deposition Exhibits Nos. 9 and 11; Deposition of Merton Levey at 37.) Moreover, DESC accounts became active after DEC ceased operation, as reflected by monthly

---

3. Steinberg did not even realize that he was an officer of DEC. (Deposition of Meyer Steinberg at 4.)

4. The memorandum lists the following DEC to TELCO overhead payments:

October 1975 . . . . . . . . . . . . . . . . . . . . . . . . . $10,627
February 1976 . . . . . . . . . . . . . . . . . . . . . . . . $10,000
November 1976 . . . . . . . . . . . . . . . . . . . . . . . $ 7,000
January 1977 . . . . . . . . . . . . . . . . . . . . . . . . $ 5,000
February 1977 . . . . . . . . . . . . . . . . . . . . . . . $10,000

(TELCO Deposition Exhibit No. 10.)

5. With regard to the $7,000 transferred in November 1976, a TELCO memorandum written in that month states: "At the advice of counsel . . . Telco withdrew the bulk of the balance in the account ($7,000) and deposited same in Total Energy Leasing Corporation's New York account with Chemical Bank." (TELCO Deposition Exhibit No. 9.)

6. With regard to the $10,000 transferred in February 1977, a TELCO memorandum written in that month states: "In view of the pending demise of the Dixie Energy Corporation and/or Dixie Square Shopping Center, it was proposed and approved by all that the bulk of Dixie's bank account be transferred to Total Energy Leasing Corporation's New York account with Chemical Bank." (TELCO Deposition Exhibit No. 11.) Concerning this same transaction, Levey stated:

I would say it was a business decision in which the money was removed pending the demise [of DEC], so that you then wouldn't have any funds attached as such as the company went under, but that you would hold the funds and then be able to allocate them as a business judgment, rather than have them attached as such.

(Deposition of Merton Levey at 37.)

payments to DESC by F. W. Woolworth ("Woolworth") of $1,333.33 in March, April, May, June, and July of 1977. (TELCO Deposition Exhibit No. 13.) These amounts correspond to Woolworth's monthly rate for energy services from DEC. (Deposition of George Myrtetus at 45–46.) Myrtetus, president of TELCO, DEC, and DESC, was unable to explain why these amounts belonging to DEC began appearing among the receipts of DESC. (*Id.* at 46.) Levey, vice–president of TELCO, DEC, and DESC, speculated that the Woolworth payments might have been put into DESC's account so that they could be segregated and not put into DEC and "eaten up ... [b]y creditors." (Deposition of Merton Levey at 32.)

▆ Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in a case "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is upon the moving party to establish the lack of a triable issue of fact, and all doubts must be resolved against that party. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Joseph v. Brierton,* 431 F.Supp. 50, 52 (N.D.Ill.1977). The court, however, "has the power to penetrate the allegations of fact in the pleadings and look at any evidential source to determine whether there is an issue of fact to be tried." *Kirk v. Home Indemnity Co.,* 431 F.2d 554, 559 (7th Cir. 1970). Moreover, Federal Rule of Civil Procedure 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Fed.R.Civ.P. 56(e).

Recently, in *CM Corp. v. Oberer Development Co.,* 631 F.2d 536 (7th Cir. 1980), the United States Court of Appeals for the Seventh Circuit reiterated the three elements necessary to pierce the corporate veil. The court stated:

In *Turner,* this court held that a parent corporation would be responsible for the obligations of its subsidiary when the subsidiary has become its mere instrumentality. In order to establish that a parent should be held liable for the obligations of its subsidiary, three elements must be proved: "control by the parent to such a degree that the subsidiary has become its mere instrumentality; fraud or wrong by the parent through its subsidiary, e. g., torts, violation of a statute or stripping the subsidiary of its assets; and unjust loss or injury to the claimant, such as insolvency of the subsidiary."

*Id.* at 538, *quoting Steven v. Roscoe Turner Aeronautical Corp.,* 324 F.2d 157, 160 (7th Cir. 1963). Regarding the first necessary element of control by the parent such that the subsidiary is its mere instrumentality, the following factors are to be considered in determining whether the requisite degree of control has been maintained by the parent:

(a) The parent corporation owns all or most of the capital stock of the subsidiary.

(b) The parent and subsidiary corporations have common directors or officers.

(c) The parent corporation finances the subsidiary.

(d) The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.

(e) The subsidiary has grossly inadequate capital.

(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(h) In the papers of the parent corporation or in the statements of its officers,

the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(i) The parent corporation uses the property of the subsidiary as its own.

(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(k) The formal legal requirements of the subsidiary are not observed.

*CM Corp. v. Oberer Development Co.*, 631 F.2d 536, 539 (7th Cir. 1980), *quoting Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir. 1963).

█ It is well–established in this circuit that each one of the three elements must be proven before the doctrine of piercing the corporate veil will be imposed. *In re Bowen Transports, Inc.*, 551 F.2d 171, 179 (7th Cir. 1977); *Avco Delta Corp. v. United States*, 540 F.2d 258, 264 (7th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *Bernardin, Inc. v. Midland Oil Corp.*, 520 F.2d 771, 774 (7th Cir. 1975); *Allegheny Airlines, Inc. v. United States*, 504 F.2d 104, 112 (7th Cir. 1974), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 470 (1975). Generally, stock control and common officers and directors are prerequisites to piercing the corporate veil, but these factors alone are not sufficient to do so since "such factors are common business practice and exist in most parent and subsidiary relationships." *Id.* It must be shown that another entity "actually dominated a sham corporation." *CM Corp. v. Oberer Development Co.*, 631 F.2d 536, 539 (7th Cir. 1980), *quoting In re Bowen Transports, Inc.*, 551 F.2d 171, 179 (7th Cir. 1977).

█ Applying the law to the facts in the instant case, the court must first determine whether TELCO exercised the requisite amount of control over its subsidiary by considering the factors outlined by the Seventh Circuit in *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir. 1963). The court will consider the factors *seriatum* :

(a) *The parent corporation owns all or most of the capital stock of the subsidiary.* This element is clearly met in the present case. TELCO owns one hundred percent of the stock of DESC, a wholly–owned TELCO subsidiary; DESC in turn owns one hundred percent of the stock of DEC.

(b) *The parent and subsidiary corporations have common directors or officers.* This element also is clearly met in the present case. TELCO, DESC, and DEC have the same officers and directors.[7]

(c) *The parent corporation finances the subsidiary.* The Steinberg loan of $100,000 to DESC to purchase DEC was reflected in a note given to Steinberg by TELCO. Subsequently, Steinberg issued a check for $20,000 to DEC which was used to meet operating cost deficits. Again, Steinberg received a note for the loan from TELCO, not DEC. This pattern clearly establishes that the parent corporation, TELCO, financed its subsidiary DEC.

(d) *The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.* Although TELCO did not cause the original incorporation of DEC, TELCO did incorporate DESC for the sole purpose of owning DEC. DESC, as a wholly–owned TELCO subsidiary, had no profits or losses nor any function other than the ownership of DEC. Thus, in this case, TELCO's incorporation of DESC had the same effect as TELCO subscribing to all of DEC's capital stock or otherwise causing DEC's incorporation.

(e) *The subsidiary has grossly inadequate capital.* DEC had a capitalization of $2,000.

---

**7.** As previously noted, TELCO has one additional director. (TELCO Answer to NI–GAS Interrogatory No. 1.)

In 1976, two years after TELCO's acquisition of DEC, DEC's capital stock and earned surplus was minus $51,796.15. Thus, DEC appeared to have grossly inadequate capital.[8]

(f) *The parent corporation pays the salaries and other expenses or losses of the subsidiary.* Since DESC and DEC directors and officers received no salary or compensation for their positions but rather received compensation only as directors and officers of TELCO, TELCO certainly paid the salaries of these individuals. Expenses for trips made by the officers on behalf of DEC and DESC also were paid by TELCO. The salaries of other employees also were paid by TELCO from a single TELCO account used to pay the salaries of employees of all subsidiaries with no distinction made among the various subsidiaries. Moreover, Steinberg's check for $20,000 to DEC to meet operating costs deficits was reflected in a note issued to Steinberg by TELCO. Thus, TELCO paid the salaries and other expenses and losses of DEC.

(g) *The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.* DEC's business was to supply energy to the Dixie Square tenants. Thus, although TELCO often conducted business with the tenants with no mention of DEC,[9] DEC did conduct business other than that business conducted with TELCO. DEC also had assets in the form of a plant and equipment which were owned by DEC prior to TELCO's acquisition of DEC. Thus, DEC does have business other than business with TELCO as well as assets other than those conveyed to it by TELCO.

(h) *In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.* The record before the court shows that important DEC business dealings were conducted in the name of the parent TELCO. In 1976, Levey corresponded with Penney's threatening to cut off DEC services to Penney at Dixie Square. The letter was written on TELCO stationery. Penney corresponded directly with TELCO. Similarly, Commonwealth Edison corresponded directly with TELCO regarding temporary electric power service to DEC for DEC customers. In addition, TELCO sent registered letters to Dixie Square tenants demanding payment of services and threatening a cut-off of services. The letters were on TELCO stationery and signed by Levey simply as "Vice President." Also, TELCO directly sent a purchase order for boiler repairs for DEC on TELCO stationery.[10] Thus, DEC's business and financial responsibilities clearly were referred to as TELCO's own in TELCO's correspondence with DEC customers and creditors.

(i) *The parent corporation uses the property of the subsidiary as its own.* A TELCO memorandum in 1976 states that TELCO withdrew $7,000 from the DEC bank account and deposited in TELCO's account on "the advice of counsel." In January 1977, a TELCO memorandum states: "In view of the pending demise of the Dixie Energy Corporation and/or Dixie Square Shopping Center, it was proposed and approved by all that the bulk of Dixie's bank account [$10,000] be transferred to Total Energy Leasing Corporation's New York account with Chemical Bank." (TELCO

---

8. TELCO's argument that DEC's inadequate capitalization is not the fault or responsibility of TELCO is unpersuasive. While DEC's capital was established by the original incorporators, TELCO may not rely upon the original capitalization. In this case, TELCO acquired DEC nine years after DEC's incorporation and DEC's already poor financial position continued to decline after the TELCO acquisition.

9. *See* discussion of element (h) *infra.*

10. The court finds TELCO's arguments that it did not explicitly refer to DEC as a department or division to be unpersuasive. TELCO's papers regarding the Dixie Square tenants, as well as the Penney, Commonwealth Edison, and boiler repair letters, clearly show that DEC's business and financial responsibilities rested with TELCO.

Deposition Exhibit No. 11.)[11] Regarding the transfer of the $10,000, Levey stated:

> I would say it was a business decision in which the money was removed pending the demise, so that you then wouldn't have any funds attached as such as the company went under, but that you would hold the funds and then be able to allocate them as a business judgment, rather than have them attached as such.

(Deposition of Merton Levey at 37.) Similarly, the payments by Woolworth belonging to DEC for energy services for five months in 1977 instead were placed in the DESC accounts. Based upon the record before the court, the court finds that TELCO used the property of its subsidiary DEC as its own.

(j) *The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.* None of the directors of DEC and DESC were compensated for their services to these corporations. Rather, they were compensated directly by TELCO for their services as officers and directors of TELCO. Indeed, Steinberg, treasurer and a director of DEC, DESC, and TELCO, did not even know that he was an officer or director of DEC. The board of directors meetings for DEC and DESC were held concurrently and no formal distinction was made between DESC and DEC business. All TELCO, DEC, and DESC board of directors' meetings were held at TELCO's New York office. Thus, DEC's directors did not act independently in the interest of DEC but took their orders from TELCO in TELCO's interest.

(k) *The formal legal requirements of the subsidiary are not observed.* "Formal legal requirements" for the purpose of piercing the corporate veil refer to whether separate corporate identities are maintained between the parent and the subsidiary regarding physical locations of the corporations, recordkeeping, payroll, and the like. *See American Trading & Production Corp. v. Fischbach & Moore, Inc.*, 311 F.Supp. 412, 415–16 (N.D.Ill.1970). In the instant case, while the physical locations of DEC and TELCO are nominally in different places, the formal records of DEC are kept at TELCO's office in New York; payrolls are not separately maintained; and assets were transferred back and forth between DEC and TELCO. *See id.* Thus, the formal legal requirements of DEC for the purpose of piercing the corporate veil were not observed.

In sum, these are the factors to be considered in determining whether a parent corporation exercises sufficient control over a subsidiary such that the subsidiary is a mere instrumentality of the parent corporation. Each of these factors need not be met. Rather, the presence of these factors in the proper combination is controlling. *CM Corp. v. Oberer Development Co.*, 631 F.2d 536 (7th Cir. 1980), *quoting Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir. 1963). In the present case, almost all of the relevant factors have been met.[12] Thus, the court finds that the factors in this case are present in the proper combination to conclude that DEC is a mere instrumentality of TELCO.

Having established that the first element is present in this case, the court considers the other two elements necessary to pierce the corporate veil: (1) fraud or wrong by the parent through its subsidiary, *e. g.*, torts, violation of a statute, or stripping the subsidiary of its assets and (2) unjust loss or injury to the claimant, such as insolvency of the subsidiary.

The fraud or wrongdoing by the parent corporation through its subsidiary alleged in the instant case is asset stripping. Levey, vice–president of TELCO, DEC, and DESC, admitted that $10,000 removed from DEC's bank account and placed in TELCO's

---

**11.** These two transfers were characterized in a March 1977 TELCO memorandum as "overhead payments" by DEC to TELCO. *See* TELCO Deposition Exhibit No. 10.

**12.** Only two factors arguably have not been met in this case: (d) and (g). All of the other factors clearly have been met in the present case.

bank account was not "overhead" but was made as a "business judgment" to prevent the $10,000 being attached as DEC "went under." Similarly, Woolworth made several monthly payments for DEC services to DESC. Levey speculated that the funds were segregated to avoid being eaten up by creditors.[13] The court finds that these actions by TELCO constitute the stripping of assets from DEC. Thus, the second element necessary to pierce the corporate veil has been satisfied in the instant case.

The third element required in order to pierce the corporate veil is unjust loss or injury to the claimant, such as insolvency of the subsidiary. In *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 160 (7th Cir. 1963), the United States Court of Appeals for the Seventh Circuit quoted *Fisser v. International Bank*, 282 F.2d 231, 238 (2d Cir. 1960), where the court listed the elements necessary to pierce the corporate veil. The *Fisser* court concluded that the "unjust loss of injury" element occurs where the parent corporation's control of and breach of duty to the subsidiary corporation proximately causes the injury or unjust loss complained of by the plaintiff. *Id.* at 238. The *Fisser* court determined that the parent corporation must use its control over its subsidiary "to perpetrate the violation of any duty, statutory or otherwise, or any act, unjust or otherwise, in contravention of the [plaintiff's] legal rights." *Id.* at 239. Applying this standard to the instant case, the court finds that TELCO did exercise its control over DEC to strip DEC of its assets and maintain DEC in a state of gross undercapitalization which resulted in the injury to NI–GAS and the contravention of NI–GAS's legal rights as a creditor of DEC.

Thus, the court finds that all three elements necessary to pierce the corporate veil have been satisfied in the instant case. Therefore, the court concludes that NI–GAS is entitled to a judgment as a matter of law that TELCO is liable for the debt of its subsidiary DEC.

Accordingly, the motion for summary judgment on the complaint is granted.

It is so ordered.

---

**13.** Levey stated in a later affidavit that the payments received from Woolworth were deposited with DESC because the payments "may have been over–payments, and thus subject to return." (Affidavit of Merton Levey, October 1979, at ¶ 11.) DESC's account ledger refers to the Woolworth payments as customer over–payments. TELCO, however, offers no authority to substantiate the claim that the payments were in fact overpayments; nor does TELCO show the final disposition of the $10,-

000. Rather, TELCO contends that the handling of the Woolworth payments raises a genuine issue of material fact precluding summary judgment. TELCO, however, cannot stand on the allegations contained in its pleadings regarding this issue. Pursuant to Federal Rule of Civil Procedure 56(e), TELCO must set forth specific facts showing that there is a genuine issue for trial. If TELCO does not so respond, summary judgment, if appropriate, shall be entered against it. Fed.R.Civ.P. 56(e).