HARLINGTON WOOD, Jr., Circuit Judge.
This case is an appeal from a district court ruling which reversed an order by the bankruptcy court allowing the Trustee of Palmer Trading Company (Palmer Trading) to retain a tax refund check from the United States Treasury in the amount of $40,-073.08 and payable to GNB, Inc. (GNB), a corporate affiliate and predecessor of Palmer Trading. The central issue on appeal is whether the district court, 15 B.R. 276 (D.C. 111.1981), properly concluded that the affiliated corporations’ behavior did not produce wrong and harm to creditors sufficient to allow the bankruptcy Trustee to marshall GNB’s tax refund to satisfy the claims of Palmer Trading’s creditors.
I.
Both GNB and its successor and affiliate Palmer Trading were Illinois corporations engaged in the business of selling commodities options, chiefly those listed on the London Commodity Exchange. Both corporations were controlled by Arthur Palmer, who was President of both corporations and owned the entire stock of Palmer Trading and two-thirds of the stock of GNB. The bankruptcy court found that new regulations promulgated by the Commodities Futures Trading Commission (CFTC) prompted Arthur Palmer to cause GNB to cease active operations in 1976 and also to incorporate Palmer Trading to continue the business activities of GNB. The reason for this transfer, as the bankruptcy court found, was that GNB had been conducting its business affairs in a negligent fashion and that its books and records were in such disarray that prohibitive time and effort would be entailed in reconstructing them sufficiently to meet new CFTC licensure criteria. Palmer Trading, starting with a clean *1013 accounting slate, would be thus able to carry on GNB’s business with federal approval.
Pursuant to this plan, on October 12, 1976, GNB transferred its assets, including its customer lists and open commodity positions, to Palmer Trading. GNB thereafter ceased its active business of commodity trading, and its only activities after the transfer were the preparation of its books and records for an Internal Revenue Service audit in 1978, payment of a salary to Arthur Palmer, and payment of payroll tax for GNB employees. Although GNB’s accountant testified that, as of the trial date, it was impossible to determine whether GNB was a creditor or a debtor of Palmer Trading, other evidence indicated that Palmer Trading possessed a positive net worth and was able to meet its financial obligations until the events giving rise to its bankruptcy.
As the Trustee conceded at trial, the immediate cause of the bankruptcy which gives rise to this matter was not any conduct of GNB or Palmer Trading in connection with the 1976 transfer of business or subsequent intercorporate behavior, but rather an employee embezzlement which caused the business of Palmer Trading to decline drastically. Palmer Trading thereafter filed its petition under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 1101-74; in early 1978, the Chapter XI proceedings terminated and the case was then converted into a liquidation bankruptcy proceeding under Chapter VII of the Bankruptcy Act, 11 U.S.C. §§ 701-77. During the course of the proceedings, the Trustee of Palmer Trading, believing GNB and Palmer Trading to be indistinguishable entities, collected a $40,073.08 tax refund check payable to GNB which resulted from losses sustained by GNB and its consequent overpayment of taxes prior to its cessation of active operations and the transfer of its assets to Palmer Trading.
In response, GNB filed an adversary complaint for conversion against the Trustee, seeking a return of the tax refund check to GNB on the basis that GNB was a separate corporation entitled to retain funds nominally payable to it. The Trustee argued in defense that GNB was merely an “alter ego” of Arthur Palmer and Palmer Trading, a “shell” whose assets were subject to the trustee’s control, and that GNB should be estopped from denying that it transferred the tax refund to Palmer Trading in view of its transfer of its entire business operations to the successor corporation. After a trial, the bankruptcy court ruled in favor of the trustee on both affirmative defenses and denied GNB’s claim to return of the funds.
The bankruptcy court articulated three grounds for piercing the corporate veil separating GNB and Palmer Trading in order to permit the trustee of the latter to obtain GNB’s tax refund: 1) evidence that the two companies were operated as a common vehicle to do the bidding of Arthur Palmer; 2) evidence that the plaintiff engaged in conduct which was calculated to conceal from the public (including creditors, customers and regulatory authorities) the material facts relating to its solvency and manner of doing business; and 3) an inference that creditors of Palmer Trading were harmed by their reliance upon the merged identities of GNB and Palmer Trading.
As to the first two grounds, the bankruptcy court pointed to a variety of evidence which demonstrated the corporations’ own disregard for corporate formalities and their failure to properly account for the transfer of assets and liabilities from GNB to Palmer Trading. Inter alia, the bankruptcy court noted the use of GNB stationery for sales confirmations of orders placed with Palmer Trading; the continued use of a GNB bank wire transfer account to assist in the exercise of options by Palmer Trading customers; the use by both corporations of the same Telex machine to receive and transfer both funds and orders; the occupation of the same suite of offices, with GNB listed on the door even after supposedly ceasing operations; the failure to notify GNB creditors of the transfer of GNB assets to Palmer Trading and the continued billing of GNB for goods and services con *1014 sumed by Palmer Trading (e.g., GNB continued as nominal lessee of the office suites; telephone, duplicating and equipment bills were directed to GNB) which led to a belief by creditors that the two entities were identical; the indiscriminate payment of ordinary business debts by either corporation interchangeably; undocumented inter-company transfers made in bulk, with only belated attempts to allocate expenses; a failure to rectify the accounts between the two corporations sufficiently to allow them to operate independently; the failure to account for assets of some GNB subsidiaries ostensibly transferred to Palmer Trading; assumption by Palmer Trading of the defense of state and federal actions against GNB, and an attempt by Palmer Trading to stay these actions and then to extend to itself the protection of this stay; the instruction given to Palmer Trading employees that they were to identify themselves as GNB employees when placing customer orders with brokerage houses so that GNB accounts could serve as conduits for the transfers; the payment of a large salary by GNB to Arthur Palmer after GNB had supposedly ceased operations; and finally, exact identity of employees, accounting firms, law firms and chief executive officers and major shareholders.
The bankruptcy court reasoned that this evidence displayed an apparent lack of regard for the requirements and responsibilities imposed upon a corporate entity, and that the purpose of GNB’s transfer of its ongoing business was to obscure its prior improper activities and practices which, if discovered, would have caused the termination of GNB’s business. The court declined to consider conclusive certain indicia of corporate separateness (e.g., different ownership, different officers and directors, possession by only Palmer Trading of a CFTC license, separate bank accounts, separate employee identification numbers, and separate books of account), noting that Arthur Palmer effectively controlled both corporations, that Palmer Trading’s exclusive possession of a CFTC license was due only to GNB’s inability to obtain one, and that other attempts at accounting segregation were overshadowed by widespread intermingling of corporate affairs and other unorthodox and careless business practices. Indeed, the bankruptcy court concluded that continued maintenance of some of the normal corporate formalities illustrated precisely the kind of wrongful “deceit” which was practiced in order to allow Arthur Palmer to continue his business of options trading.
Having established that the unorthodox business practices were deceitful, the bankruptcy court briefly addressed the third ground of its holding. The court asserted that reliance by creditors of Palmer Trading upon the intertwining of GNB and Palmer Trading was “clearly detrimental” to these creditors. Noting that it was not in any way addressing the individual liability of Arthur Palmer, the court concluded that evidence of intermingling, deception and harm to creditors justified the piercing of the corporate veil to permit the Trustee to reach GNB’s tax refund.
On appeal, the district court did not challenge the bankruptcy court’s numerous findings of intermingled operations and unorthodox business practices, but rather concluded that these findings were not legally sufficient to support a piercing of the corporate veil separating the affiliates. As the district court noted, this circuit has elaborated a three-pronged test to determine whether a corporate entity should be disregarded for equitable purposes. First stated in Steven v. Roscoe Turner Aeronautical Corporation, 324 F.2d 157, 160 (7th Cir.1963), that test requires that in order for the assets of one corporation to be used to satisfy the liabilities of another, there must be present
control by the parent to such a degree that the subsidiary has become its mere instrumentality; fraud or wrong by the parent through its subsidiary; e.g., torts, violation of a statute of stripping the subsidiary of its assets; and unjust loss or injury to the claimant, such as insolvency of the subsidiary.
The three-part Turner inquiry has been employed by this court to analyze relations between affiliate corporations as well as *1015 between parent and subsidiary corporations. In re Bowen Transports, Inc., 551 F.2d 171, 179 (7th Cir.1977); Avco Delta Corporation Canada Ltd. v. United States, 540 F.2d 258, 264 (7th Cir.1976).
The district court concluded that the bankruptcy court erred as a matter of law in failing to require affirmative proof of all three elements of the Turner formula. It accepted arguendo the bankruptcy court’s findings of commingling of funds, identity of owners and employees, identity of offices, disregard of accounting and legal formalities, and some manipulation of assets.[1] However, it concluded, this evidence should have led only to the satisfaction of the first element of the Turner test; it established merely that GNB had dominated Palmer Trading, and that as a result, the two corporations did not function as separate and independent entities. The bankruptcy court erred, the district court concluded, in failing to undertake a rigorous analysis of the second two elements of the Turner test: the perpetration of a wrong through the exercise of intercorporate control, and a loss to creditors as a result of this control.
The district court first noted that since the Trustee was acting on behalf of Palmer Trading, seeking an asset of GNB, the requirement of a “wrong” could only be satisfied by a showing that GNB committed a wrong through Palmer Trading. The bankruptcy court, however, pointed merely to the general “deceit” underlying the formation of Palmer Trading as a successor corporation to conduct GNB’s business on a clean slate, and to the indiscriminate shuttling of assets and liabilities between the corporations. The district court, conceding the impropriety of the affiliates’ bookkeeping and business practices, nonetheless concluded that GNB’s aim of reorganizing its business in order to qualify for a license was not unlawful and that any obscuring of improper business conduct harmed creditors of GNB, which was left as a dormant entity, rather than creditors of Palmer Trading, which received the ongoing business. The district court also noted an absence of record evidence indicating that Palmer Trading was undercapitalized, stripped of assets, or that the assets of the two corporations were otherwise manipulated to Palmer Trading’s detriment.
The district court also found that the bankruptcy court did not properly administer the third prong of the Turner test — the determination of unjust loss or injury resulting from intercorporate manipulation. Specifically, the district court noted that the bankruptcy court failed to address the question of whether there existed any causal link between loss or injury to Palmer Trading’s creditors and the wrong found under the second branch of the Turner test. While conceding that Palmer Trading’s creditors were harmed by its insolvency, the district court emphasized the uncontested evidence that Palmer Trading’s financial collapse had nothing to do with inadequate bookkeeping, manipulation of assets or commingling of funds between the affiliátes but rather stemmed from an employee embezzlement. Thus, even adopting arguendo the bankruptcy court’s finding that wrongful control was exerted by GNB over Palmer Trading, the district court concluded that the creditors’ reliance on such wrongful control did not cause their injury. Therefore, the district court reasoned, disregarding the corporate veil was inappropriate under either an “alter ego” or equitable estoppel theory.
Noting that it did not mean to condone the irregular business practices identified by the bankruptcy court, the district court noted the lack of evidence to satisfy the wrongful conduct and resultant loss elements of the Turner test and reversed the decision below. This appeal by the Trustee followed.
*1016 II.
We note at the outset this court’s strict adherence to the stringent three-part test for corporate veil-piercing enunciated in Steven v. Roscoe Turner Aeronautical Corporation, 324 F.2d 157, 160 (7th Cir.1963), requiring affirmative proof of control and domination by one corporation of another, fraud or wrong committed by one corporation through another (especially torts, statutory violations, or asset stripping), and unjust loss or injury to the claimant, such as insolvency of the subsidiary, resulting from the wrongful conduct. CM Corp. v. Oberer Development Co., 631 F.2d 536, 538 (7th Cir.1980); In re Bowen Transports, Inc., 551 F.2d 171, 179 (7th Cir.1977); Avco Delta Corporation Canada Ltd. v. United States, 540 F.2d 258, 264 (7th Cir.1976); Northern Illinois Gas Co. v. Total Energy Leasing Corp., 502 F.Supp. 412, 420 (N.D.Ill.1980). We have also repeatedly recognized that “one of the primary purposes of the corporate form of business is to insulate shareholders from unlimited liability, and that the power to pierce the corporate veil should be exercised reluctantly and cautiously,” CM Corp. v. Oberer Development Co., 631 F.2d at 541.
This court has been particularly attentive to the requirements of the Turner test that a specific and intentional abuse of control be a proximate cause of the injury complained of. The decisional law reveals a careful and rigorous assessment by the courts of the evidence supporting these latter two prongs of the formula. See CM Corp., 631 F.2d at 541; Bowen Transports, 551 F.2d at 179; Avco Delta, 540 F.2d at 265; Northern Illinois Gas, 502 F.Supp. at 419-20. We agree with the district court that the bankruptcy court erred in failing to carefully assess the evidence of intentional fraud or wrong, and in assuming rather than demonstrating that the business irregularities found were a source of injury to the creditors.
A. Requirement of a Fraud or Wrong
In Turner, this court cited torts, statutory violations and the stripping of assets as examples of fraud or wrong sufficient to satisfy the second prong of the veil-piercing test. Turner, 324 F.2d at 160. In subsequent cases involving both parent and subsidiary and affiliate corporations where, as here, no statutory violation or tort is present, this court has required evidence that the controlling entity held out the debtor corporation as an ongoing and viable entity while in fact rendering it a mere shell lacking ability to meet its obligations. See CM Corp., 631 F.2d at 539 (no basis for jury to find requisite wrong without evidence of fraud or asset-stripping perpetrated by controlling firm to make controlled firm insolvent); Avco Delta, 540 F.2d at 264 (requisite wrong found in series of coordinated transfers designed to drain lienee corporation of tangible assets); Northern Illinois Gas, 502 F.Supp. at 419-20 (Turner “wrong” in asset-stripping to prevent stripped funds from being attached by creditors).
Here, by contrast, there was no evidence that Palmer Trading was undercapitalized or systematically stripped of its assets. Although the record indicated that Palmer Trading did pay for a variety of services (e.g., telephone, duplication) rendered to GNB, and that some assets of GNB may never have been transferred to Palmer Trading, there was uncontradicted testimony that prior to the embezzlement Palmer Trading was solvent and able to meet its regular expenses, and that as a result of the 1976 transfer, Palmer received more assets than liabilities.[2] On the evidence educed at trial, it cannot be said that Palmer Trading was rendered a mere asset-shorn shell maintained to lull creditors into believing that requisite security existed to cover their claims. If anything, the district court noted, the evidence indicates that Palmer *1017 Trading creditors received a net benefit from the transfers and subsequent commingling of funds and that the only wrong arguable perpetrated was to the detriment of GNB’s pre-transfer creditors, whose rights are not at issue here.
The bankruptcy court did not attempt to address the fraud or wrong requirement within the framework of Turner and its progeny, instead relying upon its finding that GNB “engaged in conduct which was calculated to conceal from the public (including its customers, creditors and regulatory authorities) the material facts which related to its solvency and manner of doing business.” As the court further explained,
It is clear that the purpose of the transfer of [GNB’s] ongoing business was to obscure its prior improper activities and practices, practices which if properly discovered would have caused the termination of GNB’s business. The officers, directors and shareholders of both GNB and Palmer Trading Company were the only persons in a position to know of these activities. Certainly, the public with which they dealt had no knowledge of the improper business practices and as a result relied upon the conduct of both corporations which implied to all that GNB and Palmer Trading Company were one and the same operation.
In urging this court to sustain the bankruptcy court’s findings of requisite wrong, the Trustee would have us go even further and hold that, where affiliate corporations are concerned, it need not be demonstrated that a specific wrong such as asset-stripping has been perpetrated by one of the affiliates in controlling the other, but that the requisite wrong can be assumed from the “intentional blurring of corporate identities.” Both the bankruptcy court’s and the Trustee’s positions are wholly unprecedented and are indeed inimical to the policies embodied in the Turner formula.
There is no authority in this circuit suggesting that the presence of an affiliate, rather than a parent-subsidiary, relationship warrants a more lenient application of the Turner test to allow automatic veil-piercing where evidence of extensive commingling is offered. In the face of attempts to pierce the veil separating corporate affiliates, this court has employed the same three-part test of control, wrong committed through an affiliate, and resultant injury as rigorously as in parent-subsidiary situations. See Bowen Transports, 551 F.2d at 179; Avco Delta, 540 F.2d at 264. The Trustee cites our decision in Avco Delta for the proposition that the presence of an affiliate relationship obviates the need for proof of wrong inflicted by a dominant upon a subservient corporation. An examination of that opinion, however, reveals the opposite. There, the court supported its judgment that sufficient wrong had been committed with evidence of a series of systematic, coordinated and furtive transactions among lateral affiliates and their parent which bled the lienee corporation of over $900,000 in tangible assets for nominal consideration, with the result that the lien-ee corporation’s liabilities far exceeded its assets. Avco Delta, 540 F.2d at 265. Acceptance of the Trustee’s argument would simply amount to an abolition of the Turner test’s requirement of a specific wrong perpetrated against a dominated corporation. We decline to summarily discard a vital component of such a well-settled rule.
The bankruptcy court’s position, although less extreme than that of the Trustee, is no less flawed. The bankruptcy court purported to find the requisite wrong in the creation by GNB of its successor Palmer Trading, and the subsequent transfer of its business without adequate notification to its creditors. But this reasoning, like the Trustee’s argument, sidesteps the Turner requirement that tangible harm be inflicted by the controller through the controlled corporation, such as asset-stripping, tort or statutory violation. CM Corp., 631 F.2d at 538; Bowen Transports, 551 F.2d at 179. While the bankruptcy court rightly disapproved of the regulation-dodging motives giving rise to the creation of Palmer Trading and the careless commingling of the affiliate corporations’ business affairs, which gave the impression of merged corporate identities, these conclusions seem more *1018 properly directed to the “mere instrumentality” branch of the Turner test and do not demonstrate the perpetration of an independent wrong through a dominated corporation. Although some academic commentators have suggested that courts should be willing to pierce the corporate veil on behalf of creditors who are affirmatively misled or unequipped to ascertain the true resources of the subsidiary or affiliate with whom they are dealing, even these writers hypothesize some form of asset-stripping or undercapitalization as a predicate for such a “misrepresentation” inquiry.[3] Here, by contrast, the bankruptcy court pointed to no specific crippling impairment of Palmer Trading’s assets inflicted by its corporate controller, but only to the suggestion of “deceit” underlying Palmer Trading’s formation and its continuing intermingling with GNB. This will not suffice to dissolve the shield of limited liability protection under the equitable but nonetheless rigorous Turner doctrine.
B. The Requirement of Unjust Loss or Injury
The third branch of the Turner test requires “unjust loss or injury to the claimant, such as insolvency of the subsidiary.” Turner, 324 F.2d at 160. Subsequent decisions in this circuit have emphasized the common sense inference that the required “loss or injury” must be the proximate result of the fraud or wrong found in the second branch of the Turner test. CM Corp., 631 F.2d at 541; Northern Illinois Gas, 502 F.Supp. at 420. Here, the bankruptcy court did not inquire into the existence of such a causal connection but merely asserted in conclusory fashion that reliance by Palmer Trading’s creditors upon the blurred identity of GNB and Palmer Trading was “clearly detrimental” to them. The district court rejected this assertion, noting that there was a total absence of causal connection between any identity-blurring and the creditors’ injury; the latter’s monetary injury, it noted, stemmed solely from the embezzlement by a Palmer Trading employee and the subsequent insolvency of the corporation. As in his view of the requirement of a fraud or wrong, the Trustee has taken an even more extreme position than that of the bankruptcy court. He argues that the fact that the embezzlement caused Palmer Trading’s insolvency' is simply a “red herring” designed to confuse the court, and that injury may be assumed from the blurring of corporate identities. We agree with the district court that, even accepting arguendo the bankruptcy court’s finding of sufficient wrongful conduct, neither the injury theory of the bankruptcy court nor that of the Trustee is sustainable under the Turner test.
The Trustee argues that this court’s decision in Avco Delta, 540 F.2d 258 (7th Cir. 1976), demonstrates that injury may be inferred from a finding of wrong. There, he argues, the Turner test was found to be satisfied even though the company’s losses which gave rise to a tax lien were caused by its regular business operations rather than by the wrongful asset-stripping that was found to constitute the Turner -required “wrong.” But this analysis overlooks the fact that in Avco Delta there was evidence that the government lienor’s rights were impaired by acts of the corporate affiliates apart from the losses sustained in regular business, viz., a systematic and furtive series of transactions which drained the lienee affiliate of its tangible assets for nominal consideration, resulting in an excess of liabilities over assets. Avco Delta, 540 F.2d at 265. And to the extent that the Avco Delta decision is not explicit about the necessity of demonstrating a causal nexus between wrong and injury, any lingering ambiguity was laid to rest in our more recent decision, CM Corp. v. Oberer Development Co., 631 F.2d 536, 541 (7th Cir.1980). There we anticipated the argument made here that the creditor injured by an insolvency need not, under Turner, establish a causal link be *1019 tween that insolvency and a wrongful act of the controlling corporation:
It is true that when this action was filed, [the controlled corporation] was insolvent. But no evidence was presented to show why [it] became insolvent. If the assets of [the controlled corporation] were raided by [the controlling corporation] to make [the controlled corporation] insolvent, or if some fraud were perpetrated by [an arm of the controlling corporation] to make the [controlled corporation] insolvent, then an action to pierce [the controlled corporation’s] veil might very well be justified.
In short, there is simply no precedential basis for the Trustee’s proposed rule that a creditor’s injury should be presumed to be linked to a finding of wrongful manipulation.[4]
The bankruptcy court’s conclusory assertion that Palmer Trading creditors were “clearly” injured by the intertwining of GNB’s and Palmer Trading’s identities suffers from a similar failure to closely examine the causal nexus between wrong and injury, as required under Turner and subsequent cases. The bankruptcy court failed to buttress its conclusion with any evidence that Palmer Trading’s creditors were monetarily injured by any conduct of the affiliates apart from the embezzlement which triggered insolvency. There is no demonstration that, had Palmer Trading creditors not relied on the blurring of corporate identities, they would have in any way been better off either before or after the embezzlement. Such a demonstration is essential, for if it were not required, any bankruptcy creditor would be entitled to be satisfied from the assets of any affiliate of the bankrupt if the creditor could point to some unrelated inter-affiliate irregularity. Accordingly, we decline to find the third branch of the Turner test satisfied here in the absence of evidence linking the putatively wrongful blurring of corporate identity and specific injury to Palmer Trading’s creditors. CM Corp., 631 F.2d at 541; Northern Illinois Gas, 502 F.Supp. at 420.
CONCLUSION
While the power of the court to disregard the corporate fiction is one guided by equitable principles, it is nonetheless invoked sparingly, in view of the important and salutary policies underlying the grant of limited shareholder liability. CM Corp., 631 F.2d at 541; Henn, Law of Corporations, § 146 at 252 (1970 ed.). In Turner, this court codified the considerations that were to guide the invocation of that power into a formula that has been carefully elaborated over the last two decades. We agree with the district court that the bankruptcy court erred in failing to guide its inquiry rigorously by the branches of that test requiring an affirmative demonstration of wrong committed through a corporation and a causal relation to some specific resultant injury sustained by the claimant.
For these reasons, we affirm the decision of the district court.
Affirmed.

. GNB mounted a challenge to several of the bankruptcy court’s findings of fact, e.g., Arthur Palmer’s treatment of corporate accounts as his own, confusion of records, and transfer of GNB liabilities to Palmer Trading. Because we accept the district court’s conclusions of law even assuming arguendo that the bankruptcy court’s factual findings were correct, we need not address whether the findings were clearly erroneous.

. Although the Trustee suggests that testimony regarding the solvency of Palmer Trading at the time of its birth is not compelling in light of Arthur Palmer’s admitted uncertainty as to whether GNB was a debtor or creditor of Palmer Trading at the time of the trial and in view of numerous subsequent transfers, the Trustee offered no affirmative proof of Palmer Trading’s undercapitalization or its subjection to asset-stripping.

. See Posner, The Rights of Creditors of Affiliated Corporations, 43 U.Chi.L.Rev. 499, 516-24 (1976); Landers, A Unified Approach to Parent, Subsidiary, and Affiliate Questions in Bankruptcy, 42 U.Chi.L.Rev. 589, 625-26 (1975); Note, Liability of a Corporation for Acts of a Subsidiary or Affiliate, 71 Harv.L. Rev. 1122, 1129 (1958).

. Alternatively, the Trustee argues that in Ber-nadin, Inc. v. Midland Oil Corp., 520 F.2d 771 (7th Cir.1975), this court approved the district court’s piercing of a corporate veil, relying on its conclusion that a parent corporation had retained the debtor subsidiary as a mere shell to insulate itself from liability to the subsidiary’s creditors. Here, the Trustee argues, GNB was likewise operated as a shell, retaining no customer accounts. This argument, however, turns the causal nexus requirement of Turner on its head. For requisite wrongful injury to have occurred to the claimants here, it would have had to have been inflicted through the operation of Palmer Trading as an undercapi-talized, asset-shorn shell. But as discussed in II.A. supra, no affirmative demonstration was made that Palmer Trading was so impaired. Maintenance of GNB as an asset-less shell could only have harmed GNB creditors, not Palmer Trading creditors. Therefore, Bemadin, if anything, underscores the remoteness of the present case from the paradigm case of a requisite causal nexus. See Oberer, 631 F.2d at 541; Northern Illinois Gas, 502 F.Supp. at 420.