[Civ. No. 18578. Fourth Dist., Div. One. Feb. 23, 1981.]

INSTITUTE OF VETERINARY PATHOLOGY, INC.,
Plaintiff and Appellant, v.
CALIFORNIA HEALTH LABORATORIES, INC., et al.,
Defendants and Appellants.

112

COUNSEL

Wylie A. Aitken, John Bradshaw and John C. Adams III for Plaintiff and Appellant.

Freshman, Mulvaney, Marantz, Comsky, Forst, Kahan & Deutsch, Wesley B. Hills and Linda G. Landres for Defendants and Appellants.

OPINION

**WIENER, J.**—This case involves the economic life and corporate death of the Institute of Veterinary Pathology, Inc. (IVP). IVP, believing its untimely demise was due to the actions of defendants USV Pharmaceutical Corporation (USV), National Health Laboratories Incorporated (NHL), and Revlon, Inc., sued for compensatory and punitive damages for the tortious destruction of its business. A jury agreed, awarding IVP $88,000 in compensatory damages against all defendants plus $221,000 and $442,000 in punitive damages against NHL and USV respectively. Revlon escaped assessment for punitive damages because the court directed a verdict in its favor on that issue. In posttrial proceedings, the court also granted Revlon's motion for judgment notwithstanding the verdict (NOV) and granted the motions by NHL and USV for new trial unless IVP accepted $26,250 in satisfaction of all verdicts. Plaintiff appeals the directed verdict, judgment NOV, and the new trial order.[1] We conclude each of the court's orders has adequate legal and factual support. Accordingly, we affirm.

### Factual Background

IVP is the surrogate for Dr. Charles Sodikoff, a veterinary pathologist, a rare professional, uniquely qualified to perform and analyze clinical diagnostic testing on animals. In September 1969, Dr. Sodikoff

---

[1]Counsel for the parties will note we omit certain procedural and factual details in our opinion. We admit to simplifying the procedural morass of whether the court granted Revlon's nonsuit motion as to punitive damages or directed a verdict on that issue. For our purposes, the label given is immaterial because our scope of review is the same. (*Estate of Lounsberry* (1957) 149 Cal.App.2d 857, 858 [309 P.2d 554]; *Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84].) We also do not dwell on such matters as the myriad of corporate names used by California Health Laboratories (CHL), defendant's cross-appeal, or the fact that NHL as cross-complainant obtained a verdict of $4,523.80 against IVP.

went into business with Dr. Russell Irwin of the San Diego Institute of Pathology (SDIP) to establish and manage a veterinary division for that laboratory. It was Sodikoff's job to introduce into the San Diego veterinary community the relatively new concept of veterinary pathology. He prepared educational materials to solicit customers, presented lecture series on clinical pathology, personally contacted local veterinarians, developed "panel testing" procedures specifically designed for non-human samples, established a list of "normal values" for the various animals commonly treated by veterinarians in the San Diego area, and developed special forms for requesting and reporting of veterinary pathology tests for SDIP customers. Through his efforts, SDIP acquired about 50 to 60 veterinary clients generating gross monthly sales of between $5,000 and $6,000.

The parties parted in July 1970 because this pioneering venture was not sufficiently profitable for SDIP. Sodikoff was permitted to withdraw, taking with him the veterinary pathology business he developed with SDIP, the good will created, and the IVP trade name which he incorporated.

Sodikoff made contact with a Norbert Mootz, the director and part owner of Automated Biochemistry (ABC), an established laboratory which did some veterinary testing. In September 1970, they orally agreed ABC would perform laboratory testing services for one-half of IVP's gross billing for each test IVP interpreted for veterinarians. ABC would pick up samples, deliver the results, and provide office space and clinical apparatus. IVP was to handle its own billing and collections and interpret test results for its veterinary clients. Dr. Sodikoff was to continue to solicit new business. In effect, they were to engage in a cooperative effort to conduct veterinary pathology.

California Health Laboratories (CHL), wholly owned by Revlon, acquired ABC in April 1971. By August 1972, CHL was one of a number of labs comprising the health services division of USV, a wholly owned subsidiary of Revlon. NHL is the successor-in-interest to CHL. (In this opinion NHL and CHL are used interchangeably.)

Richard Whalley, a trained forensic pathologist, replaced Mootz as director of the CHL laboratory in early 1972. Robert Draper was his immediate superior. In 1971, Draper was the western division vice president of the health services division of USV. He became general

manager of that division in March 1972. He reported to John H. Williford, who in 1972 was chairman of the board of directors and chief executive officer of USV. Mr. Williford was also on Revlon's board.

In the spring of 1972, Dr. Sodikoff became interested in selling IVP. He met with Draper and offered the business to CHL for $100,000 plus $2,000 monthly if he were to remain as a consultant. He gave Draper a profit and loss statement to serve as the basis for CHL's independent economic evaluation. After preparing a cost projection, CHL's controller, Hal Lawrence, concluded the purchase of IVP would result in a monthly net loss to CHL. There was no further discussion relating to the purchase.

Sometime after Lawrence prepared his cost projection, about mid-July 1972, CHL decided to terminate its relationship with IVP. Several factors contributed to this decision, including a deteriorating relationship with Dr. Sodikoff. Draper told Whalley to handle the termination.

CHL, unlike SDIP, did not wish to eliminate its veterinary pathology activities because absent Sodikoff, it felt the business could be lucrative. Accordingly, in order to establish its competitive position, CHL ordered veterinary forms comparable to those previously used by IVP modified to reflect the change in business ownership. CHL also compiled and reviewed IVP's billing data and customer list to determine their worth. All this was done without telling Dr. Sodikoff. The forms were hidden at CHL where Sodikoff would not see them. On August 1, 1972, Sodikoff was inadvertently told by a CHL employee his relationship was about to end. He telephoned Whalley, who verified the information—termination was effective immediately. He received more formal notice a few days later in CHL's certified letter dated August 1. The activities of CHL to assure its place in the market from mid-July to August 1, 1972, are deferred to our discussion of punitive damages. Suffice it to say, CHL successfully gained a place in the market. In doing so, IVP was effectively squeezed out. It died in December 1972.

*Revlon's Liability*

*The Directed Verdict on Punitive Damages*

█ The granting of a motion for directed verdict is tested against a rigorous standard. We may affirm only when we are satisfied that after taking plaintiff's evidence in the light most favorable to it, including

indulging in every legitimate inference, the evidence would not support a jury verdict in its favor. (*Elmore* v. *American Motors Corp., supra,* 70 Cal.2d 578, 583; *Ewing* v. *Cloverleaf Bowl* (1978) 20 Cal.3d 389, 395 [143 Cal.Rptr. 13, 572 P.2d 1155].) ▮ In applying this standard, we hold Revlon's relationship with NHL and USV, based on either "alter ego" or agency principles, did not warrant the issue of its liability for punitive damages to reach the jury.

*Alter Ego*

▮ A parent corporation is not liable for the torts of its subsidiaries simply because of stock ownership. (*Northern Natural Gas Co.* v. *Superior Court* (1976) 64 Cal.App.3d 983, 991 [134 Cal.Rptr. 850].) Liability may be imposed only where the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former. (6 Witkin, Summary of Cal. Law (8th ed. 1974) Corporations, § 11, p. 4323; 7 A.L.R.3d 1343.) "With increasing frequency, courts have demonstrated a readiness to disregard the corporate entity when a wholly owned subsidiary is merely a conduit for, or is financially dependent on, a parent corporation. In the interests of justice and to prevent fraud, the courts will ignore the existence of a corporate entity used to cut off either causes of action against or defenses by another corporate entity." (1A Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1980) § 296.02, pp. 14-32.1—14-33.)

▮ Whether alter ego applies is a question of fact which necessarily varies according to the circumstances of each case. (*Associated Vendors, Inc.* v. *Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 836-837 [26 Cal.Rptr. 806]; *McLoughlin* v. *L. Bloom Sons Co., Inc.* (1962) 206 Cal.App.2d 848, 851-852 [24 Cal.Rptr. 311].) The trier of fact must consider whether (1) such a unity of interest in ownership exists so as to dissolve the separate corporate personalities of the parent and the subsidiary, relegating the latter to the status of merely an instrumentality, agency, conduit or adjunct of the former, and (2) an inequitable result will occur if the conduct is treated as that of the subsidiary alone. (*Automotriz etc. De California* v. *Resnick* (1957) 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042]; *Walker* v. *Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 1001 [149 Cal.Rptr. 119].)

Here, IVP points to the following facts relating to Revlon's management, control and domination over USV and NHL which would have supported a jury verdict in its favor: (1) Revlon owned 100 percent of

the stock of both USV and NHL; (2) interlocking directors and officers of Revlon, USV and NHL (the record, however, only establishes the directors and officers of NHL as of 1973); (3) the minute and stock books of both USV and NHL were kept by Revlon's secretary at its New York corporate headquarters; (4) consolidated financial statements including income from divisions and subsidiaries were contained in Revlon's annual reports; (5) Draper's testimony relating to the corporate structure of Revlon relative to USV and NHL; and (6) Lawrence's testimony regarding his transfers from a Revlon-owned company to USV, then to CHL as its controller.

 This evidence, however, only establishes intercorporate connections between Revlon, USV, and NHL. It fails to set forth any direct evidence of Revlon's manipulative control of its subsidiaries which would require imposition of liability. There is nothing to support a finding that the validly formed and existing corporate subsidiaries were only instrumentalities or conduits for Revlon.

Interlocking directorates, although of concern because of the potential for improper conduct of the parent over a subsidiary is not, in and of itself, sufficient without direct evidence of specific manipulative conduct to warrant the piercing of the corporate veil. Further, in light of the equitable nature of the doctrine in controversy, IVP has failed to satisfy the necessary requirement of establishing an inequitable result if the conduct were to be treated as that of the subsidiaries alone.

*Agency*

IVP alternatively urges "there is ample evidence ... that Mr. Draper was acting in [a] managerial capacity, exercising ... broad discretion over the acts of NHL within the extensive authority emanating directly from Revlon's board of directors through his immediate superior, Mr. Williford." In other words, "[t]he jury ... could have found that [he] was acting as an agent, in a managerial capacity for Revlon in exactly the same sense as he was for USV."

 Punitive damages may be imposed against a principal for the acts of an agent where the principal authorized the doing and the manner of the act, the agent was employed in a managerial capacity and was acting in the scope of employment or the principal approves the act. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822 [169 Cal.Rptr. 691, 620 P.2d 141].) There is no evidence

Draper was an agent and employee of Revlon. The record only establishes he was a managerial employee of USV. Although Williford was the chief executive officer and chairman of the board of directors of USV, his position on Revlon's board of directors alone, without more, is not sufficient evidence to support a finding of agency between Revlon and Draper, as it does not establish the assumption of a supervisory role by Revlon over USV. (See generally, *Walker* v. *Signal Companies, Inc., supra,* 84 Cal.App.3d at pp. 1001-1002.)

### Compensatory Damages—The Judgment NOV

Guided by the foregoing discussion, we also conclude the court properly granted the judgment notwithstanding the verdict in favor of Revlon in regard to compensatory damages. Applying essentially the same rigorous standard used to test the directed verdict on punitive damages, but in a different procedural context, we agree there was insufficient evidence to support a verdict in plaintiff's favor for compensatory damages. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877-878 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110-111 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].) Granted, there is a difference between punitive and compensatory damages because of the necessary finding of malice with regard to the former. Nevertheless, even where compensatory damages are at issue, there must be some other basis other than stock ownership to establish liability for the tortious acts of a subsidiary. (*Northern Natural Gas Co.* v. *Superior Court, supra,* 64 Cal.App.3d at p. 991.) Because IVP has failed under both alter ego and agency principles to establish Revlon's corporate responsibility for the conduct of its subsidiaries during the period in question, the court correctly determined Revlon has no liability.

### The New Trial Order

#### General Principles and Considerations

IVP attacks the new trial order claiming the court's specification of reasons is inadequate to comply with the requirements of Code of Civil Procedure section 657 as construed in *Mercer* v. *Perez* (1968) 68 Cal.2d 104 [65 Cal.Rptr. 315, 436 P.2d 315] and *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359 [90 Cal.Rptr. 592, 475 P.2d 864], and even if adequate, it is not supported by substantial evidence.

A trial court has considerable power in ruling on a motion for a new trial. Granting or denying the motion rests in its sole discretion which will not be disturbed on appeal unless a manifest and unmistakable abuse of that discretion clearly appears. (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 796, 482 P.2d 681, 52 A.L.R.3d 92].) Code of Civil Procedure section 657 provides such an order based upon the ground of insufficiency of the evidence should be reversed "only if there is no substantial basis in the record" for any of the reasons specified in the order. Underlying policy reasons for this trial court prerogative include not only the notion that trial judges are in a better position to judge the credibility of witnesses and must necessarily do so in determining whether a new trial is essential to achieve justice, but also there can be no harm when parties are afforded the full opportunity to relitigate their controversy. Implicit in this latter premise is that a second trial is the same as the first save only for the time lag. We disagree with this premise, for the burden on our courts, the difficulties in gaining access for trial, the immense cost of litigation, and the social and psychological expense to the parties, now appear to far outweigh the simple maxim that a full retrial is the solution in every case where a new trial order is tied to a number of reasons and only one of those reasons has validity. An all or nothing rule makes little sense.

We recently expressed our frustration with the present legislative scheme in *Delos* v. *Farmers Insurance Group* (1979) 93 Cal.App.3d 642, 667-668 [155 Cal.Rptr. 843]. There, after describing the court's reduction of damages as inordinate because of what we held was its erroneous view of the law, we lamented it was indeed unfortunate that a more judicially efficient approach was not possible by merely sending the case back for reconsideration of punitive damages in light of our opinion. For reasons which will become apparent, we would like to do the same here to allow the very experienced and capable trial judge who presided over this case to consider modification of his post trial rulings in accordance with our comments, including, if necessary, limiting the issues on retrial.[2]

---

[2]The trial court was not requested, nor did it order, a limited new trial restricted to one or more issues. (See *Leipert* v. *Honold* (1952) 39 Cal.2d 462, 467 [247 P.2d 324, 29 A.L.R.2d 1185].) "The power of an appellate court in reviewing an order granting a new trial must be distinguished from its power on an appeal from a judgment. Where an appeal is from the whole judgment, a reviewing court may, upon reversal of the judgment, order retrial of a particular issue if 'those trial court determinations which were affected with error may be fairly and conveniently severed from those which were not.' [Citations.]" (*Richard* v. *Scott* (1978) 79 Cal.App.3d 57, 69, fn. 4 [144 Cal.Rptr. 672].)

The court's reasons granting defendants' motion for new trial were contained in a 14-page document. In effect, the court relied on two alternative grounds. First, IVP was not entitled to punitive damages because the evidence was insufficient to establish any tortious conduct by NHL, its wrongful termination of IVP without reasonable notice constituting no more than a breach of contract. ▆ Second, damages, both compensatory and punitive, were excessive. We conclude the second reason is legally and factually sound. Accordingly, we must affirm. ▆ As we will point out, however, there was ample evidence to support the jury's finding of tortious conduct warranting a punitive damage award. Unfortunately, we may not merely remand to the trial court for reconsideration of its determination IVP was not entitled to punitive damages. Our discussion represents only guidance for the trial court upon retrial. We hope, however, our comments will motivate the trial bar and other interested persons to take up the cudgels for a legislative solution which can protect the conflicting interests involved while permitting a less costly judicial process.

### Excessive Compensatory Damages

▆ The court found $88,000 in compensatory damages to be excessive and reduced them to $26,250. Its specifications, reasons and reference to the factual record are meticulous. The court reviewed the three witnesses' respective conclusions of IVP's value of $100,000 (Sodikoff), $104,170 (Richard Mills for IVP), $9,000-$15,000 (Arthur Bradshatzer for defendants). The court also carefully evaluated Mills' arguments and found his conclusion to be arithmetically unpersuasive and incomplete. The court compared this analysis with that of Bradshatzer which it found to be intellectually and mathematically sound. The court further opined that even the reduced value had some blue sky because there was no willing or knowledgeable buyer interested in purchasing IVP. We hold the court acted within its discretion in reducing the amount of compensatory damages and in granting the motion for new trial unless IVP accepted the reduced sum.

### Excessive Punitive Damages

The court also granted the new trial on the ground the punitive damages were excessive and against the law. It found there was no evidence to warrant an award of damages against USV and the punitive damages award against CHL was grossly excessive. We respectfully

disagree with the court's reasoning for as we shall explain, there is a substantial evidentiary basis and legal justification for an award of punitive damages. Nevertheless, and even though the court also erred in rejecting wealth as a factor in determining the size of a punitive damage award, it did correctly describe the need for there to be some relationship between the amount of compensatory, $26,250, and punitive damages in assessing the propriety of the punitive damage award. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) This reason alone requires us to affirm the new trial order. ■ Deference must be given to the trial court for "it is in a far better position than an appellate court to determine whether a damage award was influenced by 'passion or prejudice.' [Citation.]" (*Schroeder* v. *Auto Driveway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662].) It has "the prerogative to independently determine the reprehensibility of defendants' conduct in a particular case and may consider the amount of compensatory damages in assessing the degree of reprehensibility." (*Delos* v. *Farmers Insurance Group, supra*, 93 Cal.App.3d 642, 666.) ■ Thus, here, although some of the court's reasons for granting the new trial are, in our view, erroneous, the correct reasons stated are sufficient to support the new trial order.[3]

The court recognized the basic "purpose of punitive damages is to punish, not to make plaintiff wealthy." While complimenting IVP's counsel for his talented advocacy, it expressed concern that counsel's

---

[3]The reasons we hold erroneous include the court's conclusion defendants' conduct was not tortious, its apparent concern with the windfall aspect of punitive damages, and the immateriality of wealth as a factor in determining the amount of punitive damages. In addition, we respectfully disagree with the court's finding there was insufficient evidence to warrant punitive damages against USV. The trial judge explained such liability would have been based upon the actions of USV's vice-president Draper; that he never ratified Whalley's actions, and that he merely instructed CHL to sever relations with IVP, delegating the full responsibility as to manner, method and time of severance to Whalley.

Punitive damages can properly be awarded against a principal for an act of an agent not only if the former authorizes or ratifies the latter's act but also if "' ... the agent was employed in a managerial capacity and was acting in the scope of employment....'" (*Egan* v. *Mutual of Omaha Ins. Co., supra*, 24 Cal.3d at p. 822; Rest. 2d Torts, § 909.) Draper's managerial position with USV as vice president and general manager of its health services division, taken with evidence of the manner in which Whalley, Lawrence and Cleveland conducted themselves in reference to the entire matter, supports a finding of a ratification by USV. The parties continued to work for NHL and they were never criticized or disciplined for their conduct by Draper, who said he was satisfied with the method in which the termination was handled. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 154, p. 754.)

continued reference to the well publicized $118 million punitive damage award against Ford Motor Company caused the jury to emotionally respond in calculating punitive damages. Although we believe there was sufficient evidence to support a punitive damage award, we cannot substitute our instincts at this level for the sound judgment of the trial judge in assessing the degree of reprehensibility involved. The trial court, in a much better position to determine the degree of reprehensibility, found there was no rational relationship between the amount of punitive damages and the extent of the wrong and, accordingly, ordered a new trial. In light of the respective roles between the trial and appellate courts, we defer to this exercise of trial court discretion.

*Defendants' Tortious Conduct—Interference With a Prospective Business Advantage*

The court's specification of reasons in its new trial order included its determination that plaintiff, as a matter of law, was not entitled to punitive damages. It said, "This action falls squarely within the parameters of C. C. 3294, the obligation arising out of contract and the termination, for the various reasons given herein, was not tortious and may not be so stretched so as to give rise to any entitlement for punitive damages." IVP reacts to this characterization of its lawsuit by claiming the entire matter reeks of NHL's conscious and premeditated plan to take advantage of IVP's known vulnerabilities enabling it to solicit and pirate as many of IVP's clients as possible.

The tort of intentional interference with prospective business advantage has been described as a relatively unsettled and developing legal phenomenon, the principles of which are still very vague. (*Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 822 [122 Cal.Rptr. 745, 537 P.2d 865]; *Lowell v. Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 17 [144 Cal.Rptr. 664].) It is premised upon the ideal "[e]veryone has the right to establish and conduct a lawful business and is entitled to the protection of organized society, through its courts, whenever that right is unlawfully invaded." (*Buxbom v. Smith* (1944) 23 Cal.2d 535, 546 [145 Cal.Rptr. 305].) It "imposes liability for improper methods of diverting or taking business from another ... [, which] 'are not within the privilege of fair competition.'" (*Baldwin v. Marina City Properties, Inc.* (1978) 79 Cal.App.3d 393, 406 [145 Cal.Rptr. 406].) Consequently, "in order to be actionable the interference with prospective economic advantage or advantageous business

relationship must be *unjustified and/or without privilege....* The un-justifiability or wrongfulness of the act may consist of the *methods* used *and/or* the *purpose* or motive of the actor.... [It] will lie where the right to pursue a lawful business is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification [citations]." (*Lowell* v. *Mother's Cake & Cookie Co., supra,* 79 Cal.App.3d at pp. 17-18.) ▮ The elements of the tort in our context include (1) the existence of a prospective business relationship advantageous to plaintiff, (2) defendants' knowledge of the existence of the relationship, (3) defendants' intentional conduct de-signed to disrupt the relationship, (4) actual causation, and (5) damages to plaintiff proximately caused by defendants' conduct. (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827; *Baldwin* v. *Marina City Properties, Inc., supra,* 79 Cal.App.3d at p. 407; see generally, *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.* (1978) 283 Ore. 201 [582 P.2d 1365, 1368-1371]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 389-397, pp. 2640-2652.) Simply stated, the market-place should not be immune from ethics.

▮ Our review of the record as qualified by the court's comments at the new trial motion, supports IVP's contention defendants' acted tortiously. Draper's decision to terminate CHL's contractual relation-ship with IVP was made between mid-July and the 28th of that month. CHL, wanting to stay in the veterinary business, prepared the necessary veterinary reports and request forms without disclosure to Sodikoff. After preparing the forms and customer lists, Whalley and Lawrence prepared to launch a sales program to assure CHL's place in the market. Concurrently with Sodikoff's termination, they held a sales meeting to instruct CHL's sales personnel, including Dennis Cleveland, the sales manager for CHL, on the method of conducting its concen-trated sales campaign directed at soliciting veterinary accounts in San Diego. Whalley gave specific instructions on how to make the contacts with potential clients. Although the sales staff was told to say nothing derogatory about Sodikoff, they were instructed to explain there had been a voluntary disassociation between the parties. They were also told to explain, that because of the elimination of certain services, the veter-inarians would receive a price reduction of 10 percent and supplies used to collect specimens would be provided free of charge. If a doctor wished to continue with IVP, CHL could no longer collect or process the work due to the termination of the parties' relationship. This "sales blitz" of veterinary accounts occurred over a one-week period in which attention was primarily focused on the major accounts CHL identified

from IVP billing records. The better accounts were singled out for special emphasis and called upon personally by Whalley, Lawrence or Cleveland. CHL's express and admitted purpose in these pretermination secret preparations and the immediate termination without notice to IVP followed immediately by the coordinated one-week "blitz" was to gain a "competitive advantage" over IVP in CHL's effort to "attract" as many of IVP's existing accounts as possible. All this was done at a time when CHL knew the sudden termination of IVP, without notice, and simultaneous denial of any further lab facilities or services to IVP would result in its inability to continue its veterinary pathology business unless it could immediately arrange for equivalent lab services, a task virtually impossible in the position it found itself. Sodikoff's efforts to use stop-gap measures to mitigate his losses were unsuccessful. He ultimately discontinued his business in December 1972.

We think this conduct describes more than a breach of contract. CHL had no justification or privilege to surreptitiously engage in a course of conduct designed to deprive IVP of its business. Granted the trial court apparently did not believe CHL intended to pirate IVP's business, since IVP, as the "shell" of Dr. Sodikoff, rendered a unique personal service of interpretive veterinary analysis which CHL wished to discontinue. We have no quarrel with the court's finding CHL had the right to return to the veterinary testing it had done before the joint venture without the expensive and unprofitable services of Sodikoff. We are concerned not with CHL's right to return to simple veterinary testing, but with its manner of transition. Even bound by the trial court's findings of the joint ownership of the customer lists and forms and that canvassing of the veterinary community was authorized only after the termination of the parties' relationship, one cannot rationalize defendants' conduct as being within the realm of fair competition. This is especially true in light of the parties' contractual relationship and the fiduciary implications of the trial court's finding the parties' relationship constituted a joint venture. Accordingly, putting aside the issue of damages, IVP was the victim of the tort in controversy based upon defendants' conduct viewed as a whole and highlighted by the immediate termination of its relationship with IVP without reasonable notice with the apparent intent to render IVP unable to either effectively service its existing customers or to successfully resist CHL's preplanned and aggresive solicitation of IVP's customers, ultimately resulting in its functional demise. If the evidence at retrial is similar to that presented here, a reasonable award of punitive damages against NHL and USV may properly be imposed.

*Disposition*

The judgment in favor of Revlon is affirmed. The order granting a new trial in favor of NHL and USV is affirmed. Each party is to bear its own costs on appeal.

Brown (Gerald), P. J., concurred.

Staniforth, J., concurred in the result.

A petition for a rehearing was denied March 23, 1981, and appellant's petition for a hearing by the Supreme Court was denied May 13, 1981.