[Civ. No. 33217. Fourth Dist., Div. Two. Apr. 26, 1984.]

POTLATCH CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
ROYAL INSURANCE COMPANY OF AMERICA,
Real Party in Interest.

[black redaction box]

COUNSEL

Bruggeman, Smith & Peckham and Dean F. Woolsey for Petitioner.

No appearance for Respondent.

MacLachlan, Burford & Arias and Scott J. Vida for Real Party in Interest.

OPINION

**KAUFMAN, Acting P. J.**—On cross-motions for summary judgment and summary adjudication of issues, the trial court determined as an issue without substantial controversy that petitioner Potlatch Corporation (Potlatch) is liable as a matter of law to Royal Insurance Company of America (Royal Insurance) for any damages for which Potlatch's former, but now dissolved, wholly-owned subsidiary Speedspace Corporation (Speedspace) would have been liable as a result of the collapse of a building because of an allegedly defective glue-laminated roof supporting beam manufactured by a division of Speedspace. Petitioner asserts that on the facts presented the court could exercise its discretion only in one way, to deny Royal Insurance's motion and grant its own. We issued an alternative writ of mandate to review the matter.

On or about January 30, 1979, a glue-laminated roof supporting beam manufactured by Summer Bell Structure (Summer Bell), a subdivision of Speedspace, collapsed causing extensive damage to Miller Bros. Chevrolet, an automobile dealership. Miller Bros. was insured for such damage by Royal Insurance which was required to expend large sums of money in settling claims arising from the collapse of the beam. Royal Insurance commenced this subrogation action to recoup its losses on the theory of strict products liability in tort. It proceeded against Potlatch on theories of both alter ego and successor liability.

Royal Insurance moved for a determination that Potlatch's liability for any damages for which Speedspace might have been liable was an issue

without substantial controversy. Potlatch moved the court for summary judgment on the ground that as a matter of law it was not liable. The trial court granted the motion of Royal Insurance, apparently on the basis of the decision in *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3], which held that in appropriate circumstances the successor in interest to the manufacturer of a defective product may be held liable for damages caused by the defective product at a time after the successor acquired the business of the manufacturer.

■ We conclude that the decision in *Ray* v. *Alad* is inapplicable and that the trial court's order must be vacated with directions to grant Potlatch's motion for summary judgment.

The principal business of Summer Bell throughout its history was the manufacture and sale of large custom made glue-laminated wood beams. The date the building permit was issued for the building in which the allegedly defective beam was incorporated was March 28, 1966, giving rise, as Royal Insurance asserts, to the inference that the beam was manufactured in that general time frame. At that time, Summer Bell appears to have been a division of Speedspace Corporation which had been formed as a spin-off to Summer Bell employees in about 1963 apparently in connection with a divestiture by Fluor Corporation which had owned Summer Bell. In any event, it appears most probable that the beam in question was manufactured by Summer Bell before Potlatch acquired Speedspace.

In September 1967, Potlatch entered into a "PLAN AND AGREEMENT OF REORGANIZATION" with Speedspace in which it was agreed that Potlatch would acquire 100 percent of the outstanding stock of Speedspace in exchange for a distribution to Speedspace's shareholders of a specified number of Potlatch shares. Thus, Speedspace, including its Summer Bell division, became a wholly owned subsidiary of Potlatch. After Potlatch acquired ownership of Speedspace, Speedspace's Summer Bell division continued to manufacture and sell glue-laminated wood beams under the same name previously used, utilizing the same manufacturing plant, the same offices, the same manufacturing designs and plans and the same personnel as it had prior to Potlatch's acquisition of Speedspace.

Summer Bell ceased operations in about March 1969. Nevertheless, thereafter Speedspace remained in existence until December 31, 1978, at which time it was dissolved in compliance with California law. Its business was discontinued and its plant and equipment were liquidated by an auction sale.

Potlatch did not take over the business of Speedspace nor absorb its plant and equipment.[1]

*Ray* v. *Alad Corp., supra,* 19 Cal.3d 22, involved a claim for damages for injury from a defective ladder against Alad Corporation (Alad II) which neither manufactured nor sold the ladder but which prior to the plaintiff's injury succeeded to the business of the manufacturer of the ladder, also named Alad Corporation (Alad I). Alad II, a wholly owned subsidiary of Lighting Maintenance Corporation (at pp. 26-27) had succeeded to the business of Alad I by purchasing (through Lighting Maintenance Corporation) substantially all of Alad I's assets: its plant, equipment, inventory, trade name, and good will. (At pp. 24-25.) Thereafter, Alad II "continued to manufacture the same line of ladders under the 'Alad' name, using the same equipment, designs, and personnel, and soliciting Alad I's customers through the same sales representatives with no outward indication of any change in the ownership of the business." (At p. 25; see also pp. 27-28.) The agreement of purchase and sale required Alad I "'to dissolve its corporate existence as soon as practical'" (at p. 26) and the principal shareholders of Alad I agreed not to compete with the purchased business (*ibid.*).

The trial court granted Alad II summary judgment. On appeal to the California Supreme Court, the court first observed that Alad II had not expressly or impliedly agreed to assume liability for injuries resulting from defective products manufactured by Alad I, so Alad II could not be held liable on that basis. (*Ray* v. *Alad Corp., supra,* 19 Cal.3d at p. 28.) Next the court observed that Alad II could not be found liable on the theory that there had been a consolidation or merger in which the acquiring corporation had taken all of the assets of the acquired corporation without providing any consideration that could be made available to meet claims of the acquired corporation's creditors. (At pp. 28-29.) The court then rejected the plaintiff's suggestion that the general rules governing a corporation's succession to its predecessor's liabilities should be modified to require such succession merely because of continuity factors. (At pp. 29-30.) Finally, however, the court did adopt a special rule based on public policy considerations imposing successor liability for damages resulting from injuries caused by defective products, concluding "that a party which acquires a manufacturing business *and continues the output of its line of products under the circumstances here presented* assumes strict tort liability for defects in units of the same product

---

[1]Potlatch is in the wood products business and does, and throughout its ownership of Speedspace did, also manufacture a type of wooden beam, but it was an entirely different type of beam from that manufactured by Speedspace, and the plant, equipment, production and marketing of beams by Potlatch and Speedspace were entirely separate.

line previously manufactured and distributed by the entity from which the business was acquired." (At p. 34, italics added.)

Earlier in its opinion the court had observed that the dissolution of Alad I and the distribution of its remaining assets to its shareholders, which was required by the agreement between Lighting Maintenance Corporation and Alad I by which the assets of Alad I were purchased, effectively deprived plaintiff of redress against the ladder's manufacturer. That significant circumstance and others the court had in mind in imposing successor liability "under the circumstances here presented" were made fairly clear in the two paragraphs immediately preceding the court's quoted conclusion. They read in part as follows:

"While depriving plaintiff of redress against the ladder's manufacturer, Alad I, *the transaction by which Alad II acquired Alad I's name and operating assets had the further effect of transferring to Alad II the resources that had previously been available to Alad I for meeting its responsibilities to persons injured by defects in ladders it had produced.* These resources included not only the physical plant, the manufacturing equipment, and the inventories of raw material, work in process, and finished goods, but also the know-how available through the records of manufacturing designs, the continued employment of the factory personnel, and the consulting services of Alad I's general manager. With these facilities and sources of information, Alad II had virtually the same capacity as Alad I to estimate the risks of claims for injuries from defects in previously manufactured ladders for purposes of obtaining insurance coverage or planning self-insurance. [Citation.] Moreover, the acquisition of the Alad enterprise *gave Alad II the opportunity formerly enjoyed by Alad I of passing on to purchasers of new 'Alad' products the costs of meeting these risks. Immediately after the takeover it was Alad II, not Alad I, which was in a position to promote the 'paramount policy' of the strict products liability rule by 'spreading throughout society . . . the cost of compensating [otherwise defenseless victims of manufacturing defects]'* [citations]. [Italics added.]

"Finally, the imposition upon Alad II of liability for injuries from Alad I's defective products is fair and equitable in view of Alad II's acquisition of Alad I's trade name, good will, and customer lists, its continuing to produce the same line of ladders, and its holding itself out to potential customers as the same enterprise. *This* deliberate albeit legitimate exploitation of Alad I's established reputation as a going concern *manufacturing a specific product line gave Alad II a substantial benefit which its predecessor could not have enjoyed without the burden of potential liability* for injuries from previously manufactured units. Imposing this liability upon successor manufacturers in the position of Alad II not only causes the one 'who

takes the benefit [to] bear the burden' (Civ. Code, § 3521) but precludes any windfall to the predecessor that might otherwise result from (1) the reflection of an absence of such successor liability in an enhanced price paid by the successor for the business assets and (2) *the liquidation of the predecessor resulting in avoidance of its responsibility for subsequent injuries from its defective products.* [Citations.] By taking over and continuing the established business of producing and distributing Alad ladders, *Alad II* became '*an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products*' [citation.]." (*Ray* v. *Alad Corp., supra,* 19 Cal.3d at pp. 33-34, italics added.)

In urging that the case at bench should be governed by the rule announced in *Ray* v. *Alad, supra,* 19 Cal.3d 22, Royal Insurance points out that after Potlatch acquired ownership of Speedspace, including its Summer Bell division, in September 1967, and until Summer Bell ceased operations in March 1969, Summer Bell continued to manufacture and sell glue-laminated wood beams under the same name used before Potlatch's acquisition of Speedspace, utilizing the same manufacturing plant, the same offices, the same manufacturing designs and plans and the same personnel as were being used before Potlatch's acquisition of Speedspace. Thus, Royal Insurance urges that the circumstances here are the same in substance as those involved in *Ray* v. *Alad* and that the result here should be the same as in *Ray* v. *Alad.* It is argued that the fact that Potlatch did not purchase and incorporate into its own business the physical assets of Speedspace and did not itself continue the business of Speedspace and its Summer Bell division but rather acquired the capital stock of Speedspace is but a matter of form and that substance must prevail over form. We do not agree.

Of course, substance will prevail over form. However, the fact that Potlatch did not acquire the physical assets of Speedspace and its Summer Bell division and continue the business of Summer Bell as a part of its own business but, instead, acquired the capital stock of Speedspace is no mere matter of form. It implicates fundamental concepts and principles of California and United States law: corporate identity and shareholder immunity. Further, it removes as a circumstance of this case one of, if not the most, important of the "circumstances" referred to and relied on by the court in *Alad* for the result reached in that case: the discontinuance of the manufacturing corporation and the unavailability of its assets to answer for injuries resulting from defective products manufactured by it.

When Potlatch "acquired" Speedspace, it did not acquire any of its assets, it acquired only its capital stock. Potlatch became the sole shareholder of Speedspace. ■ It is fundamental that a shareholder owns no part of the specific property of the corporation. ■ Moreover, after Potlatch

"acquired" Speedspace, it was not Potlatch that carried on the business of Speedspace and its Summer Bell division, but Speedspace itself. Speedspace was neither dissolved nor liquidated for a period of approximately 11 years thereafter.

Concomitantly, the assets of Speedspace remained exactly the same after Potlatch "acquired" it as before, and its assets remained available to answer for damages resulting from injuries caused by defective products previously manufactured by it and its Summer Bell division. It is true that on December 31, 1978, some nine years after Summer Bell ceased manufacturing the type of beams here involved, Speedspace was dissolved, its business discontinued and its physical assets liquidated by sale at auction. But Potlatch did not acquire the plant and equipment of Speedspace nor did it continue Speedspace's business.

Because of the dissolution of Speedspace in accordance with California law Potlatch ultimately received the net value of Speedspace's assets, but it did so as the sole shareholder of Speedspace. **(3)** When a corporation has been duly and lawfully dissolved, its shareholders are not liable for debts of the corporation (see *Ray* v. *Alad, supra,* 19 Cal.3d at p. 32, and authorities cited), nor is the rule changed on account of the fact that the shareholder happens to be another corporation, that is, that the dissolved corporation was a wholly owned subsidiary of another corporation. (See *Cleaning & P. Co.* v. *Hollywood L. Service* (1932) 217 Cal. 124, 129 [17 P.2d 709]; *Institute of Veterinary Pathology, Inc.* v. *California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111, 119 [172 Cal.Rptr. 74]; *Northern Natural Gas Co.* v. *Superior Court* (1976) 64 Cal.App.3d 983, 991 [134 Cal.Rptr. 850]; 6 Witkin, Summary Cal. Law (8th ed. 1974) Corporations, § 11, p. 4323.) That was the law before *Ray* v. *Alad* (see *Cleaning & P. Co.* v. *Hollywood L. Service, supra*), and it remains the law after *Ray* v. *Alad* (see *Institute of Veterinary Pathology, Inc.* v. *California Health Laboratories, Inc., supra,* 116 Cal.App.3d 111).

As a matter of fact, in *Ray* v. *Alad,* Alad II, the business successor, was a wholly owned subsidiary of Lighting Maintenance Corporation and, although the court in *Ray* v. *Alad* expressly recognized that fact (19 Cal.3d at pp. 26-27), there is nothing whatever in the court's decision suggesting that Lighting Maintenance Corporation should be regarded as the successor to Alad I and, thus, liable under the rule announced in the decision.

For the reasons stated, we conclude the *Ray* v. *Alad* decision has no applicability to the circumstances of the case at bench and that the order determining Potlatch's potential liability on that basis must be vacated.

 Although it does not argue that the present record discloses a triable issue of fact as to the alter ego theory, Royal Insurance urges nevertheless that this court should not direct the trial court to grant Potlatch's motion for summary judgment because Royal Insurance has not yet completed its discovery with respect to the issue of alter ego. Presumably it relies on subdivision (h) of Code of Civil Procedure section 437c which provides: "If it appears from the affidavits submitted in opposition to the motion that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or *discovery to be had* or may make such other order as may be just."

However, a review of Royal Insurance's opposition to Potlatch's motion for summary judgment discloses no opposition to the motion on the ground that further discovery was necessary nor any request for a continuance pending further discovery. Moreover, extensive discovery on the issue of alter ego is reflected in the record, all of it negative, and Royal Insurance has not identified to this court any specific further discovery procedures it should be permitted to pursue. There is therefore no basis on which we can properly decline to direct the trial court to enter summary judgment.

Accordingly, let a peremptory writ of mandate issue to Riverside Superior Court commanding it to vacate its order determining Potlatch's potential liability to be an issue without substantial controversy and to enter an order granting Potlatch's motion for summary judgment.

McDaniel, J., and Rickles, J., concurred.