UNITED NATIONAL RECORDS, INC., on behalf of itself and all others similarly situated, Plaintiffs,

v.

MCA, INC., et al., Defendants.

No. 82 C 7589.

United States District Court, N.D. Illinois, E.D.

Sept. 3, 1985.

Granvil I. Specks, Specks & Goldberg, James B. Sloan, Sloan & Associates, P.C., Michael J. Freed, Much, Shelist, Freed, Denenberg, Ament & Eiger, Gary L. Specks, Altheimer & Gray, Chicago, Ill., on behalf of plaintiffs.

Robert W. Bergstrom, Ronald W. Teeple, John L. Leonard, Bergstrom, Davis & Teeple, Chicago, Ill., on behalf of defendants United Artists Corp.

## MEMORANDUM ORDER

BUA, District Judge.

Before the Court is defendant United Artists Corporation's motion for summary judgment. Also pending are cross motions for Rule 11 sanctions. For the reasons stated below, United Artists Corporation's motion for summary judgment is granted and all Rule 11 motions are denied.

On November 9, 1984, the Court denied certain defendants' motion for partial summary judgment on the statute of limitations issue. *United National Records, Inc. v. MCA, Inc.*, 609 F.Supp. 33 (N.D.Ill. 1984). The Court held that plaintiffs had raised questions of fact as to whether the applicable four-year statute of limitations barred any pre-December 13, 1978 claims. Since the Court's November 9 Order, all defendants, with the exception of United Artists Corporation, have entered into settlement agreements with the plaintiff class.

Those settlements total 26.2 million dollars, excluding interest.[1]

Defendant United Artists Corporation ("UAC") had presented a separate motion for summary judgment, arguing, in addition to the statute of limitations defense, that as the former parent corporation of a record and tape producer, it was not liable for any alleged antitrust violations of its former subsidiary. The Court, on November 9, 1984, entered and continued UAC's motion pursuant to Fed.R.Civ.P. 56(f) pending the completion of discovery. Plaintiffs have now completed discovery on that issue and UAC's motion for summary judgment has been renewed and is now before the Court.

Notwithstanding UAC's suggestion to the contrary, plaintiffs, as the nonmoving parties on this motion, do not bear the burden of establishing a question of fact in order to avoid summary judgment. Summary judgment for a defendant under Rule 56 is appropriate "only if the pleadings, depositions, and affidavits fail to disclose a genuine issue of material fact." *Gracyalny v. Westinghouse Electric Co.*, 723 F.2d 1311, 1316 (7th Cir.1983). In deciding the motion, the Court must "resolve all doubts against the party seeking summary judgment." *Id.* Applying this standard, the following facts are assumed to be true for purposes of this motion.

## I. FACTS

### A. *UAC's Motion for Summary Judgment*

Plaintiffs' amended complaint[2] charges that since January 1, 1971, defendants conspired to fix, maintain and stabilize the price of records and tapes in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. UAC, a California corporation and distributor of motion picture films, has never been a producer of phonograph records or tapes. In November of 1968, however, UAC acquired 100 percent of the outstanding stock of Liberty Records, Inc., a California corporation engaged in the record business. Following UAC's acquisition of Liberty's stock, Liberty's name was changed to Liberty/UA, Inc. In February of 1971, Liberty/UA, Inc. changed its name to United Artists Records, Inc. In September of 1974, United Artists Records, Inc. changed its name to United Artists Music and Records Group, Inc. Throughout this opinion, these wholly-owned subsidiaries of UAC will be referred collectively as "UAR". UAC sold the stock of UAR in May of 1978. Throughout the November 1968 to May 1978 period, UAC owned 100 percent of the stock of UAR.

In addition to owning 100 percent of UAR's stock, several UAC directors and officers held positions as directors or officers of UAR between 1971 and 1977. See Plaintiff's Exhibit 13. For example, for a short period in 1971, the President of both UAR and UAC was David Picker. In April of 1971, Michael Stewart replaced Picker as President of UAR. During the period 1971–1975, Stewart served both as President of UAR and Vice President of UAC. In 1975, L.J. Bos, a Senior Vice President of UAC and member of UAC's Executive Committee, became UAC liaison officer for UAC with responsibility for the operations of UAR. Bos, however, did not have direct authority over UAR personnel, but rather

---

**1.** Broken down by individual defendants, the settlements are as follows: CBS, Inc., $4,250,000; MCA, Inc., MCA Records, Inc. and MCA Distributing Corp, $1,700,000; Capital Industries-EMI, Inc. and Capital Records, Inc., $2,750,000; Polygram Corp. and Polygram Records, Inc., $3,500,000; RCA Corp., $4,900,000; American Broadcasting Companies, Inc., ABC Record & Tape Sales Corporation, and ABC Records, Inc., $550,000; Warner Communications, Inc., Warner Bros. Records, Inc., Warner-Elektra-Atlantic Corp., and Atlantic Recording Corp., $8,550,000 ($50,000 cash, $5,000,000 note,

and $3,500,000 in future advertising certificates).

**2.** Although UAC's motion was directed against plaintiffs' original complaint, the Court has granted plaintiffs leave to file their first Unified and Consolidated Complaint, and will now consider UAC's motion as directed against that amended complaint. Accordingly, given the result of this motion, UAC's motion to strike and dismiss the amended complaint is moot and need not be considered by the Court.

worked through Stewart, the President of UAR at the time. In November of 1975, Bos replaced Stewart as President and Chairman of the Board of UAR. Also during the 1971 to 1977 period, UAC made cash advances to UAR in the forms of interest- and noninterest-bearing notes. As of December 31, 1977, UAC advances to UAR totaled nearly $40 million. For a brief period in 1969, UAR's payroll was paid by UAC out of UAC's New York office.

UAR kept its own books and records throughout the 1971–1978 period. UAR financial statements from 1972 to 1978 show that its assets, liabilities, capital structure, expenses, and payroll were kept separate from UAC. Although a UAR branch office was located in UAC's headquarters in New York City, UAC's executive offices were located at an office in Los Angeles.

Regarding UAR's alleged involvement in the price fixing conspiracy, plaintiffs have uncovered evidence which suggests that UDC, a distribution company for UAR, acted as a vehicle for exchanging pricing information between UAR and its competitors. At one point in August of 1972, distribution agreements between UAR, MGM, and Polydor contained a built-in mechanism for the preannouncement exchange of pricing information. On September 25, 1972, a meeting took place between representatives of UAR, Polydor, and MGM in which an understanding on pricing was reached among those present. Michael Stewart, President of UAR and Vice President of UAC, attended that meeting.

In 1978, UAC sold the stock of UAR to M & R Music Corporation. In connection with the stock sale, UAC received repayment of its advances made to UAR between 1971 and 1978. On February 5, 1979, Capital Industries-EMI, Inc. acquired UAR from M & R Music Corporation. There is no evidence in the record to suggest that UAR was ever undercapitalized or otherwise not financially responsible for its debts and liabilities either while UAR was a wholly-owned subsidiary of UAC or after UAR was sold to M & R Music Corporation.

## II. DISCUSSION

At the time of this Court's November 9, 1984 opinion, *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 160 (7th Cir.1963), was controlling precedent in this Circuit on the issue of a parent corporation's liability for the wrongs of its wholly-owned subsidiary. The Seventh Circuit had applied the *Roscoe Turner* test to various cases which involved piercing the corporate veil. *See, e.g., In re Palmer Trading Post*, 695 F.2d 1012 (7th Cir.1982) (bankruptcy); *C M Corp. v. Oberer Development Co.*, 631 F.2d 536 (7th Cir.1980) (diversity suit alleging breach of contract); *Allegheny Airlines, Inc. v. United States*, 504 F.2d 104 (7th Cir.1974) (Federal Tort Claims Act suit). Following these precedents, this Court relied upon the *Roscoe Turner* test in its November 9 opinion to determine whether UAC could be held liable for UAR's conduct.

■ Since that opinion, however, the Seventh Circuit has held that a district court must look to state law, and not the *Roscoe Turner* test, when determining whether a corporate veil should be pierced. *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 570–71 (7th Cir.1985). In *Van Dorn*, the court held that Illinois law, not federal law, provided the appropriate test for piercing the corporate veil of an Illinois corporation.

■ In this case, UAC is a California corporation and, under *Van Dorn*, California law must be utilized to supply the appropriate standards. Under California law, a parent corporation is not liable for the wrongful acts of its subsidiary simply because it is a wholly-owned subsidiary. *Institute of Veterinary Pathology, Inc. v. California Health Laboratories, Inc.*, 116 Cal.App.3d 111, 172 Cal.Rptr. 74, 77 (1981); *Walker v. Signal Companies, Inc.*, 84 Cal. App.3d 982, 149 Cal.Rptr. 119, 129 (1978); *Northern Natural Gas Co. v. Superior Court*, 64 Cal.App.3d 983, 134 Cal.Rptr.

850, 855 (1976). As the Fifth Circuit has stated:

> California [law] demands that the corporate identity be preserved unless exceptional circumstances are shown to exist. Thus, under California law, in order to hold a parent corporation liable for the acts of its subsidiary, it is not enough that observance of the separate corporate identities would be unjust or inequitable. As a condition of liability, it must also be shown that there is such a unity of interest and ownership that the individuality of the subsidiary as a distinct entity has ceased.

*United States v. Dean Van Lines, Inc.,* 531 F.2d 289, 291 (5th Cir.1976). *See also Fuls v. Shastina Properties, Inc.,* 448 F.Supp. 983, 989 (N.D.Calif.1978) (applying California law).

 Liability may be imposed upon the parent corporation for acts of its subsidiary "only where the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Veterinary Pathology, supra,* 172 Cal.Rptr. at 77. In such a case, California law requires the court to "ignore the existence of a corporate entity used to cut off either causes of action against or defenses by another corporate entity." *Id.* at 77–78 (*quoting* 1A Ballantine & Sterling, California Corporate Laws (4th ed. 1980) § 296.02, pp. 14–32.1–14–33). In order to sustain a motion for summary judgment, a parent corporation must demonstrate that there is no genuine issue of material fact concerning two issues. First, whether such a unity of interest in ownership exists between the parent and subsidiary "so as to dissolve the separate corporate personalities of the parent and the subsidiary, relegating the latter to the status of merely an instrumentality, agency, conduit, or adjunct of the former." *Id.* Second, whether "an inequitable result will occur if the conduct is treated as that of the subsidiary alone." *Id.* In this case, UAC has demonstrated that no genuine issue of fact exists as to either issue. UAR and UAC clearly maintained separate corporate personalities, and holding UAR solely responsible for its conduct will not cause an inequitable result in this case.

In *Veterinary Pathology,* the parent corporation owned 100 percent of the subsidiary's stock, both entities had interlocking directors and officers, the subsidiary's books were maintained by the parent, the subsidiary's financial statements were contained in the parent's annual reports, and the parent transferred substantial assets to its subsidiary. *Veterinary Pathology, supra,* 72 Cal.Rptr. at 78. Despite these activities, however, the court held that the parent was not liable for the conduct of its subsidiary because the evidence failed to "set forth any direct evidence of [the parent corporation's] manipulative control of its subsidiaries which would require imposition of liability." *Id.* The court held that the evidence was insufficient "without direct evidence of specific manipulative conduct to warrant the piercing of the corporate veil." *Id.* Similarly, in *United States v. Dean Van Lines, Inc.,* 531 F.2d 289 (5th Cir.1976), the court, construing California law, held that even where the parent corporation unjustly benefits from the wrongdoing of its subsidiary, without more, the corporate veil of the parent will not be pierced. *Id.* at 291.

In this case, there is no "direct evidence of specific manipulative conduct" on the part of UAC. The formal legal requirements of UAR and UAC were strictly observed. Separate records were maintained for both corporations. Minutes of UAR board meetings were scrupulously maintained. The headquarters of UAC and UAR were in New York and California, respectively, and there is no evidence to suggest that UAR conducted business solely for the exclusive benefit of UAC. Both corporations were engaged in entirely different businesses and their separate corporate personalities were maintained. In fact, the evidence in this record falls far short of the evidence submitted to the court in *Veterinary Pathology,* where the court refused to pierce the parent's corporate veil.

Additionally, UAC engaged in no conduct which would render the result of this case inequitable. *See Veterinary Pathology, supra,* 172 Cal.Rptr. at 77. UAR was not inadequately financed or stripped to its corporate shell so as to render it impossible for UAR to fulfill its obligations or liabilities. Neither is there anything in the record to suggest that UAR could not be held accountable for its own alleged antitrust violations. UAR, when sold by UAC, was apparently a financially responsible, ongoing business. Although by the time plaintiffs discovered their antitrust injuries UAR was merged into another corporation, that corporation was available for suit and, in fact, was sued in this litigation. In any event, UAC cannot be held responsible for the conduct of a former subsidiary merely because the subsidiary is not available for suit years later.[3] Although the equitable tolling doctrine suspends the statute of limitations, that doctrine does not insure that proper defendants will remain in business until discovery of the cause of action. UAR, in fact, continued to exist as a part of the Capital companies and was merged into Capital Records, Inc. on April 1, 1981. Plaintiffs have failed to demonstrate that an inequitable result will occur if UAR (now merged into Capital) is required to defend its own conduct.[4]

Plaintiffs' remaining arguments are without merit. The fact that then UAC Vice President Michael Stewart attended a meeting on September 25, 1972, in which record prices were discussed fails to raise a genuine issue of fact on whether UAC directly participated in the price fixing conspiracy. In fact, Stewart's uncontradicted testimony establishes that he had no conversations with record companies regarding record and tape pricing or other conditions of sale. Finally, plaintiff's reliance upon *Copperweld Corp. v. Independence Tube Corp.,* —— U.S. ——, 104 S.Ct. 2731,

81 L.Ed.2d 628 (1985) is misplaced. *Copperweld* held that a parent corporation and its wholly-owned subsidiary are incapable of conspiring in violation of § 1 of the Sherman Act. The *Copperweld* decision, however, did not overrule state corporate law which provides for limited liability of a parent corporation. In fact, the Court noted that separate incorporation of a parent and subsidiary often serves legitimate business and legal interests. *Id.,* at ——, 104 S.Ct. at 2742, 81 L.Ed.2d at 644. One such legitimate interest is undoubtedly the limited liability a parent corporation enjoys under state law.

### B. *Rule 11 Motions*

■ Both UAC and plaintiffs have filed motions against each other's counsel for purported Rule 11 violations. UAC complains of the filing of a later lawsuit (now dismissed but consolidated in plaintiff's amended complaint) by plaintiffs' attorneys and plaintiffs complain of misstatements in UAC's memorandum in support of its motion for summary judgment. Both motions are denied.

Throughout this litigation, the Court has had the unfortunately rare privilege of working with extremely competent and experienced antitrust attorneys. The quality of representation on behalf of all parties has been excellent. The plaintiff class, settling defendants and UAC have been fortunate to have retained such legal talent. The Court has reviewed the alleged Rule 11 infractions, and views the conduct as merely further examples of the excellent and aggressive representation that has been typical in this case. Accordingly, all Rule 11 motions are denied.

### III. CONCLUSION

United Artists Corporation's motion for summary judgment is granted. Judgment

---

**3.** The fact that UAC may have agreed with M & R Music to pay for UAR's pre-1978 liabilities is a contractual matter between the parties and is irrelevant in determining the issue here.

**4.** In finding that UAR should be charged with its own alleged violations of the antitrust laws, the

Court need not consider the issue of whether the Capital settlement agreement bars any further recovery for UAR's past conduct. At first glance, however, it would appear that plaintiffs have already recovered that money (or should have) when they settled with Capital.

is entered in favor of United Artists and against plaintiffs on plaintiffs' amended complaint. United Artists Corporation's and plaintiff's motions for Rule 11 sanctions are denied.

IT IS SO ORDERED.